J-A24005-21

2021 PA Super 251

| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| | : | |
| WAYNE SINGLETARY | : | No. 2069 EDA 2020 |

Appeal from the Order Entered September 24, 2020
In the Court of Common Pleas of Delaware County Criminal Division at
No(s): CP-23-CR-0006345-2019

BEFORE:   LAZARUS, J., DUBOW, J., and PELLEGRINI, J.[*]

OPINION BY LAZARUS, J.:                    **FILED DECEMBER 17, 2021**

The Commonwealth of Pennsylvania appeals from the order, entered in the Court of Common Pleas of Delaware County, suppressing a firearm found as a result of a warrantless search of an automobile in which Wayne Singletary was a passenger.[1]  After careful review, we affirm.

The court made the following findings of fact[2] after the suppression hearing:

---

[*] Retired Senior Judge assigned to the Superior Court.

[1] In its notice of appeal, the Commonwealth avers that the order would terminate or substantially handicap the prosecution of its case.  **See** Pa.R.A.P. 311(d) ("In a criminal case, under the circumstances provided by law, the Commonwealth may take an appeal as of right from an order that does not end the entire case where the Commonwealth certifies in the notice of appeal that the order will terminate or substantially handicap the prosecution.").

[2] **See** Pa.R.Crim.P. 581(I) ("At the conclusion of the hearing, the judge shall enter on the record a statement of findings of fact and conclusions of law as

*(Footnote Continued Next Page)*

On November 30, 2018, at approximately 12:30 p.m., in the vicinity of the 900 block of Lincoln [Street] in Chester City, Officer Terrence Taylor was on duty, in regular capacity, performing an area check [at] this location . . . based on instruction to patrol the vicinity as a result of frequent nuisance calls for loitering-groups, loud noise, and open drug activity[.] Officer Taylor approached the area of the 800 block of Hughes Street and a large group of individuals began to disperse.

Officer Taylor parked and exited his vehicle to advise the group that loitering is not permitted in the area. Officer Taylor observed a Mercedes SUV, that was not running, parked in a legal parking spot, on the opposite side of the street [from where he parked his vehicle], [which had] two individuals sitting in the [front seats. Troy L. Harris was seated in the driver's seat and Singletary was seated in the front passenger seat.]

Officer Taylor approached the driver side of the vehicle and requested identification from both [Harris] and [Singletary]. [Harris] provided Officer Taylor with a passport and [Singletary] provided Officer Taylor with a [p]hoto ID. Officer Taylor, while still standing next to the driver side of the [Mercedes], radioed the information received from the identification provided, as well as the vehicle information [for confirmation and review of outstanding warrants]. Officer Taylor determined that [Harris'] driver's license was suspended, [] that the vehicle came back as ["no record found,"[3] listed no insurance, and that the documented owner was neither Harris nor Singletary].

---

to whether the evidence was obtained in violation of the defendant's rights, or in violation of these rules or any statute, and shall make an order granting or denying the relief sought.").

[3] Officer Taylor testified that the Mercedes' registration returned "no record found." N.T. Suppression Hearing, 7/31/20, at 14. When Officer Taylor submitted the Mercedes' vehicle identification number (VIN) through the National Crime Information Center (NCIC), he testified that "the vehicle itself was suspension type[-]F, which is insurance cancelation and needed to have another registration displayed on it. . . . [T]he registration that was currently on it was not [] the one that was attached to it through PennDOT." *Id.* at 18-19.

> Officer Taylor observed an empty pill bottle in [Harris'] lap[, which he determined—based on the label—might have, at some point, contained oxycodone prescribed to someone other than Harris or Singletary.] During this time, Officer Singleton[4] arrived on the scene at the passenger door [of the Mercedes]. Officer Taylor and Officer Singleton asked [Harris] and [Singletary] to exit the vehicle. As [Singletary] exited the vehicle, the officers heard a hard metal object hit the ground, at which point [Singletary] began to run from the officers. Officer Taylor gave chase, but did not apprehend [Singletary] at th[at] time.

Order, 9/24/20, at 1-2 (findings of fact paragraphs combined). The officers recovered a firearm with an obliterated serial number from the location where they heard the sound of a metal object striking the ground.

Later that day, Singletary was arrested and charged with one count each of: firearms not to be carried without a license;[5] altered or obliterated mark of identification;[6] flight to avoid apprehension or trial or punishment;[7] recklessly endangering another person;[8] and disorderly conduct.[9] On January 31, 2020, Singletary filed an omnibus pre-trial motion seeking to suppress the firearm. On July 31, 2020, the court held a hearing on Singletary's motion, where the court found the above facts, and the parties stipulated that, if called

---

[4] The record did not disclose Officer Singleton's first name.

[5] 18 Pa.C.S.A. § 6106(a)(1).

[6] 18 Pa.C.S.A. § 6117(a).

[7] 18 Pa.C.S.A. § 5126(a).

[8] 18 Pa.C.S.A. § 2705.

[9] 18 Pa.C.S.A. § 5503(a)(1).

- 3 -

to testify at the suppression hearing, Officer Singleton would have testified that she saw the silver handgun fall from Singletary's lap as he got out of the car before he took off running. N.T. Suppression Hearing, 7/31/20, at 36-37. The court issued an order on September 25, 2020, granting suppression of the firearm. On October 23, 2020, the Commonwealth filed a notice of appeal. The court did not order the Commonwealth to file a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b),[10] but the court filed a Rule 1925(a) opinion nonetheless.

On appeal, the Commonwealth presents the following issues for our review, which we have reordered for ease of disposition:

1. Did the suppression court err by concluding that, at the time that [] Singletary was directed to exit the vehicle, the police lacked the legal authority to order [] Singletary to exit the vehicle?

2. Did the suppression court err by failing to conclude that the police interaction with the occupants of a parked vehicle, which began as a mere encounter, evolved into a lawful vehicle stop supported by reasonable suspicion and probable cause?

Appellant's Brief, at 1.

Our standard of review of a Commonwealth's appeal from a grant of a suppression order is well-settled:

[We] consider only the evidence from the defendant's witnesses together with the evidence of the prosecution that, when read in the context of the entire record, remains uncontradicted. The suppression court's findings of fact bind an appellate court if the

---

[10] The Commonwealth has properly averred that the court did not order a Rule 1925(b) statement, pursuant to Pa.R.A.P. 2111(a)(11) and (d). *See* Appellant's Brief, at Exhibit B.

record supports those findings. The suppression court's conclusions of law, however, are not binding on an appellate court, whose duty is to determine if the suppression court properly applied the law to the facts.

*Commonwealth v. Richard*, 238 A.3d 522, 525 (Pa. 2020) (quoting

*Commonwealth v. Miller*, 56 A.3d 1276, 1278-79 (Pa. Super. 2012)).

Additionally, the appellate scope of review is limited to "only evidence presented at the suppression hearing." *Commonwealth v. Moser*, 188 A.3d 478, 482 (Pa. Super. 2018) (citing *In re L.J.*, 79 A.3d 1073, 1085-87 (Pa. 2013)).

In its first issue, the Commonwealth argues that it established reasonable suspicion sufficient to require Singletary to alight from the Mercedes because Officer Taylor articulated that: the pill bottle in Harris' lap clearly did not belong to either Harris or to Singletary; the pill bottle was recognized by the officers as immediately incriminating pursuant to our Supreme Court's decision in *Commonwealth v. McCree*, 924 A.2d 621 (Pa. 2007) (plurality) (probable cause to search interior of vehicle existed based on limited automobile exception where, under totality of circumstances, officer observed pill bottle in plain view in vehicle stopped in area well-known for illegal prescription drug sales, officer was aware of other officer's pre-planned drug buy with passenger in defendant's vehicle, passenger agreed to procure additional drugs for officer, and there was no advanced warning that defendant or his car would be target of police investigation); the area where the vehicle was parked had a documented, on-going, open-air drug dealing problem; the Mercedes was uninsured and not properly registered; neither

occupant had a valid driver's license; and, consistent with illegal drug activity, a large number of people fled the area surrounding the Mercedes just as Officer Taylor approached. The Commonwealth contends that, although these facts could have innocent explanations, even a combination of innocent facts, when taken together, may warrant further investigation, and that reasonable suspicion may nevertheless be established where suspicion of criminal conduct is reasonably based upon the facts of the matter. *See* Appellant's Brief, at 18-19 (citing *Commonwealth v. Rogers*, 849 A.2d 1185, 1189 (Pa. 2004)).

In its second issue, the Commonwealth argues that reasonable suspicion and probable cause supported a vehicle stop, pursuant to 75 Pa.C.S.A. § 6308(b), because, pursuant to *Richard*, *supra*, once police learn that a vehicle is unregistered, probable cause sufficient to conduct a vehicle stop is established. Appellant's Brief, at 22. Moreover, the Commonwealth contends that, while investigating the scene further, police discovered that the occupants of the Mercedes seemed to have no lawful connection to it, the Mercedes was uninsured, the Mercedes had an improper registration attached to it, and the officers had a reasonable basis to believe that Harris was driving with a suspended driver's license. *Id.* at 22-23. The Commonwealth concludes that "nothing in the Vehicle Code or in the appellate court decisions involving a vehicle stop says that a parked vehicle cannot be the subject of a lawful vehicle stop when the police have the requisite reasonable suspicion or probable cause to make a lawful vehicle stop." Appellant's brief, at 22-23 (citing *Commonwealth v. Wright*, 224 A.3d 1104, 1106-07 (Pa. Super.

2019)). Finally, the Commonwealth relies on case law that permits the police to request a driver and passengers to alight from a lawfully stopped car, as a matter of right, without additional reasonable suspicion that criminal activity is afoot. *See Pennsylvania v. Mimms*, 434 U.S. 106 (1977); *Commonwealth v. Brown*, 654 A.2d 1096, 1102 (Pa. Super. 1995). We disagree with both of the Commonwealth's claims.

The Fourth Amendment of the United States Constitution and Article 1, Section 8 of the Pennsylvania Constitution guarantee individuals freedom from unreasonable searches and seizures. *See Commonwealth v. Bostick*, 958 A.2d 543, 550 (Pa. Super. 2008). A "warrantless search or seizure of evidence is . . . presumptively unreasonable under the Fourth Amendment and Article I, § 8, subject to a few specifically established, well-delineated exceptions." *Commonwealth v. Luczki*, 212 A.3d 530, 546 (Pa. Super. 2019). Courts in Pennsylvania require law enforcement officers to demonstrate varying levels of suspicion to justify citizen interactions, which interactions have been organized into three tiers: mere encounters, investigatory stops, and custodial detentions. *See Commonwealth v. Newsome*, 170 A.3d 1151, 1154 (Pa. Super. 2017).

> A mere encounter between police and a citizen need not be supported by any level of suspicion, and carries no official compulsion on the part of the citizen to stop or to respond. An investigatory stop, which subjects a suspect to a stop and a period of detention[,] requires a reasonable suspicion that criminal activity is afoot. A custodial search is an arrest[,] and must be supported by probable cause.

*Id.* (quoting *Commonwealth v. Kendall*, 976 A.2d 503, 506 n.2 (Pa. Super. 2009)) (brackets and ellipses omitted).

"[I]n assessing the lawfulness of citizen/police encounters, a central, threshold issue is whether or not the citizen-subject has been seized." *Id.* (quoting *Commonwealth v. Williams*, 73 A.3d 609, 613 (Pa. Super. 2013)). "[T]he issue of whether an individual has been seized is distinct from the issue of whether that seizure was reasonable." *Commonwealth v. Livingstone*, 177 A.3d 609, 619-20 (Pa. 2017). "To determine whether a citizen's movement has been restrained, courts must consider the totality of the circumstances, with no single factor dictating the ultimate conclusion as to whether a seizure has occurred." *Id.* at 621 (citation and internal quotation marks omitted). Our Supreme Court has explained the objective test which the court must apply to the totality of the circumstances of each individual case to determine if police have seized the defendant:

> No bright lines separate the[ three] types of encounter, but the United States Supreme Court has established an objective test by which courts may ascertain whether a seizure has occurred to elevate the interaction beyond a mere encounter. The test, often referred to as the "free to leave test," requires the court to determine "whether, taking into account all of the circumstances surrounding the encounter, the police conduct would 'have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business.'" [*Florida v.*] *Bostick*, 501 U.S. [429,] 437 [(1991)]. "[W]henever a police officer accosts an individual and restrains his freedom to walk away, he has 'seized' that person." *Terry* [*v. Ohio*], 392 U.S. [1,] 16 [(1968)].

- 8 -

*Commonwealth v. Adams*, 205 A.3d 1195, 1200 (Pa. 2019) (some citations omitted). *See also United States v. Mendenhall*, 446 U.S. 544 (1980); *Commonwealth v. Jones*, 378 A.2d 835 (Pa. 1977).

In applying this objective test, we have previously explained that "the focus is directed toward whether, by means of physical force or show of authority, the citizen-subject's movement has[,] in some way[,] been restrained." *Commonwealth v. Parker*, 161 A.3d 357, 363 (Pa. Super. 2017). In making this determination, we consider "all circumstances evidencing a show of authority or exercise of force, including the demeanor of the police officer, the manner of expression used by the officer in addressing the citizen, and the content of the interrogatories or statements." *Commonwealth v. Mendenhall*, 715 A.2d 1117, 1119 (Pa. 1998). Additionally, this Court has set forth non-exclusive factors for the court to consider:

> the number of officers present during the interaction; whether the officer informs the citizen they are suspected of criminal activity; the officer's demeanor and tone of voice; the location and timing of the interaction; the visible presence of weapons on the officer; and the questions asked. Otherwise[,] inoffensive contact between a member of the public and the police cannot, as a matter of law, amount to a seizure of that person.

*Parker*, *supra* (quoting *Commonwealth v. Collins*, 950 A.2d 1041, 1047 n.6 (Pa. Super. 2008) (en banc)).

"No constitutional provision prohibits police officers from approaching a citizen in public to make inquiries of them." *Commonwealth v. Boswell*, 721 A.2d 336, 340 (Pa. 1998). However, if the police action becomes too

intrusive, a mere encounter may escalate into an investigatory stop or a seizure. *Id.*

"Officers may request identification or question an individual so long as the officers do not convey a message that compliance with their requests is required. Although police may request a person's identification, such individual still maintains the right to ignore the police and go about his business." *Commonwealth v. Lyles*, 97 A.3d 298, 303 (Pa. 2014) (citations and quotation marks omitted). "[A]n encounter involving a request for identification could rise to a detention when coupled with circumstances of restraint of liberty, physical force, show of authority, or some level of coercion beyond the officer's mere employment, conveying a demand for compliance or that there will be tangible consequences from a refusal." *Id.* at 304. "[T]he retention by police of an identification card to conduct a warrant check will generally be a material and substantial escalating factor within the totality assessment." *Commonwealth v. Cost*, 224 A.3d 641, 651 (Pa. 2020) (police retention of Appellant's identification card to conduct warrant check—as Appellant was asked if there was anything in his backpack that officers needed to know about—was sufficient to signify to reasonable person that Appellant was not free to leave, resulting in seizure of Appellant).

This Court recently reiterated how police officers may require individuals to alight from their vehicles during a valid traffic stop:

> [O]fficers conducting a valid traffic stop have an absolute right to ask the occupants of a vehicle to step out of the car for the duration of the traffic stop . . . to assure [officer] safety.

- 10 -

[**Commonwealth v.**] **Reppert**, 814 A.2d [1196,] 1202 [(Pa. Super. 2002) (en banc)]. This is true even absent a reasonable suspicion that criminal activity is afoot.

This absolute right to order occupants out of a vehicle is limited in duration, however, and once the primary traffic stop has concluded . . . the officer's authority to order either driver or occupant from the car is extinguished. **Reppert**, **supra** at 1202.[11] [T]he matter of when a traffic stop has concluded or otherwise given way to a new interaction does not lend itself to a bright[-]line definition.

The United States Supreme Court has held that authority for a seizure pursuant to a traffic stop ends "when tasks tied to the traffic infraction are—or reasonably should have been—completed." **Rodriguez v. United States**, 575 U.S. 348, 349, (2015). Applying this principle, this Court's analysis of similar cases has turned on whether the purpose of the traffic stop was accomplished prior to ordering occupants out of the vehicle, and whether the occupants had previously been issued citations or told that they were free to leave.

**Commonwealth v. Palmer**, 145 A.3d 170, 173 (Pa. Super. 2016) (internal quotations, brackets, and some citations omitted).

We have previously described how the court determines whether a police officer has reasonable suspicion sufficient to conduct a warrantless search:

---

[11] In **Reppert**, this Court noted that:

Once the primary traffic stop has concluded, . . . the officer's authority to order either driver or occupant from the car is extinguished. Thus, if[,] subsequently[,] the officer directs or requests the occupants to exit the vehicle, his show of authority may constitute an investigatory detention subject to a renewed showing of reasonable suspicion."

**Reppert**, **supra** at 1202 (citations omitted).

[T]he officer must articulate specific observations which, in conjunction with reasonable inferences derived from these observations, led him reasonably to conclude, in light of his experience, that criminal activity was afoot and the person he stopped was involved in that activity.

In order to determine whether the police officer had reasonable suspicion, the totality of the circumstances must be considered. In making this determination, we must give due weight to the specific reasonable inferences the police officer is entitled to draw from the facts in light of his experience. Also, the totality of the circumstances test does not limit our inquiry to an examination of only those facts that clearly indicate criminal conduct. Rather, even a combination of innocent facts, when taken together, may warrant further investigation by the police officer.

*Commonwealth v. Fulton*, 921 A.2d 1239, 1243 (Pa. Super. 2007) (citations, quotation marks, ellipsis, and brackets omitted). The objective test "will not be satisfied by an officer's 'hunch' or 'unparticularized suspicion.'" *Commonwealth v. Beasley*, 761 A.2d 621, 626 (Pa. Super. 2000) (quoting *Commonwealth v. Arch*, 654 A.2d 1141, 1144 (Pa. Super. 1995)).

The suppression court offered analysis in support of its order suppressing the gun as fruit of the poisonous tree[12] as follows:

Officer Taylor's presence in the vicinity was appropriate based on the instructions for area checks and the intent to disperse large groups in this location. Following Officer Taylor's observation of the vehicle in which [Singletary] was a passenger, [Officer Taylor] approached the driver's side of the [Mercedes] and communicated with [Harris and Singletary]. [T]he interaction[,] at this point[, was] a mere encounter, which was reasonable, as it required no level of suspicion and carried no compulsion for [Harris] or [Singletary] to respond. Officer Taylor's request for identification was also a reasonable inquiry during this mere encounter.

_____

[12] *See Wong Sun v. United States*, 371 U.S. 471 (1963).

Officer Taylor was in full uniform at the time and remained standing next to the driver side of the vehicle, at which point Officer Singleton arrived and approached toward the passenger side of the vehicle. Both officers requested [Harris] and [Singletary] to exit the vehicle. At this point, the encounter evolved into an investigative detention. Two officers in full uniform were on either side of the vehicle, which was legally parked and not running. The officers then directed [Harris and Singletary] to exit the vehicle. Under the totality of the circumstances, no reasonable person would feel free to leave. The interaction therefore amounted to a seizure, requiring reasonable suspicion.

This encounter did not derive from a traffic stop or any unlawful or suspicious activity. There were no warrants based on the running of the identification, there were no furtive movements by either [Harris or Singletary]. The mere fact that the entirety of Chester is unfortunately a high crime area, does not, in itself, provide the reasonable suspicion necessary for an investigative detention in this situation. There were no reasonable articulable grounds for [Singletary's] seizure[.]

Order, 9/24/20, at 3.

Here, we agree with the trial court and conclude that, initially, when Officer Taylor first approached the Mercedes and requested identification from Harris and Singletary, the interaction was a mere encounter, as there was no show of force or authority on the part of Officer Taylor beyond the simple request. *See Boswell*, *supra; Lyles*, *supra* at 303. Nevertheless, the interaction evolved into an investigatory detention, *see Lyles*, *supra* at 304, at least at the point where officers stood on each side of the Mercedes, and requested the occupants to alight from the vehicle, all while the occupants'

- 13 -

identifications remained in police possession.[13] ***See Lyles***, ***supra***; ***see also Cost***, ***supra***. At the time of the officers' request to alight from the Mercedes, the officers' body positions on either side of the Mercedes restrained Singletary's liberty of movement. ***See Livingstone***, ***supra***; ***see also Jones***, ***supra*** at 840 (where officer immediately sought defendant's identification and defendant complied, officer escalated exercise of force and seized Defendant by asking Defendant to remain seated in vehicle, seeking control of Defendant's movement); ***Commonwealth v. Powell***, 228 A.3d 1, 8 (Pa. Super. 2020) (defendant subjected to investigative detention while eating inside legally parked car where officers, without observing criminal activity, parked right behind defendant's vehicle, surrounded his vehicle, and ordered defendant to lower car window). Additionally, here, while standing on either side of the Mercedes and retaining Harris' and Singletary's identification, the officers ordered Singletary and Harris out of the vehicle after a warrant check

---

[13] Singletary would have this Court find that he was seized at the point that "Officer Taylor took his identification to run his information through NCIC[.]" Appellee's Brief, at 12. Singletary's suggestion—that any time an officer retains identification a seizure results—is contrary to the established precedent of this Commonwealth that such retention is, instead, but one factor to be considered within the totality of the circumstances. ***See Cost***, ***supra*** at 651 ("[T]he retention by police of an identification card to conduct a warrant check will generally be **a material and substantial escalating factor within the totality assessment**.") (emphasis added); ***see also Lyles***, ***supra*** at 303 (police may request identification, but individual still maintains right to ignore police and go about his business). ***See also Commonwealth v. Powell***, 228 A.3d 1, 6 (Pa. Super. 2020) (quoting ***Commonwealth v. Luczki***, 212 A.3d 530, 543 (Pa. Super. 2019)) ("Officers may request identification or question an individual so long as the officers do not convey a message that compliance with their requests is required.").

revealed no outstanding warrants, which would signal to a reasonable person that they are not free to leave. *See Cost*, *supra*; *see also Adams*, *supra*. *See also Commonwealth v. DeHart*, 745 A.2d 633, 637 (Pa. Super. 2000) (interaction was investigative detention where two officers approached vehicle, positioned themselves one on each side of it, and, after requesting and confirming identification of driver and passenger, police requested individuals alight from vehicle).

Regarding the Commonwealth's argument that the officers were permitted to require Singletary to alight from the Mercedes pursuant to a vehicle stop, we find the argument to be meritless. First, we note that the Commonwealth's reliance on *Richard*, *supra*, for the proposition that a vehicle's unregistered status is sufficient to grant police probable cause, is misplaced, because the Defendant in that case operated the vehicle on Commonwealth highways.[14] *Id.* at 527; *see also* 75 Pa.C.S.A. § 1301(a).[15]

_____

[14] Here, our review of the record reveals that the officers only observed the Mercedes parked legally and the ignition turned off. The Mercedes, was, therefore, neither driven nor operated on Commonwealth highways at any time relevant to this case.

[15] The vehicle registration statute requires the vehicle to drive or move on a highway for an infraction to result. *See* 75 Pa.C.S.A. § 1301(a) ("**No person shall drive or move** and **no owner or motor carrier shall knowingly permit to be driven or moved upon any highway any vehicle which is not registered** in this Commonwealth unless the vehicle is exempt from registration.") (emphasis added). Here, the Mercedes never moved and, instead, remained parked legally throughout police observation.

Second, we are satisfied that any vehicle stop[16] of the Mercedes was fully concluded by the time the officers requested that Singletary alight from his seat since there was no further investigation to conduct as it related to any driving infraction,[17] vehicle registration infraction,[18] or vehicle insurance infraction,[19] and the officers declined to write a ticket or issue a warning to

---

[16] The Commonwealth would have this Court find that a vehicle stop may be conducted on a parked vehicle. **See** Appellant's brief, at 22-23 (citing **Commonwealth v. Wright**, 224 A.3d 1104, 1106-07 (Pa. Super. 2019)). We find **Wright** to be inapposite since the vehicle in that case was parked in a lane of travel, instead of parked in a legal parking spot. Nevertheless, we need not decide the question since any vehicle stop here would have been concluded at the time Singletary was seized, as we conclude below. **See Palmer**, **supra**; **Reppert**, **supra**. In **DeHart**, **supra**, we stated:

> We are unaware of any search and seizure law that treats a police officer approaching a stopped vehicle as a "traffic stop." Further, since a mere encounter between police officer and citizen requires no suspicion at all, the key to analyzing the within case is a determination of the point in time when Appellees were subjected to an investigative detention and whether, at that time, there existed sufficient justification for that classification of a detention.

**Id.** at 636. We proceed in the same manner as in **DeHart** by determining if at the point in time when Singletary was subjected to an investigative detention there existed sufficient justification for that detention.

[17] **See supra**, at n.12.

[18] **See supra**, at n.13.

[19] The vehicle registration statute requires the vehicle to drive or move on a highway for an infraction to result. **See** 75 Pa.C.S.A. § 1786(e)(1) ("An owner of a motor vehicle who ceases to maintain financial responsibility on a registered vehicle **shall not operate or permit operation** of the vehicle in this Commonwealth until proof of the required financial responsibility has been provided to the Department of Transportation.") (emphasis added). As noted,
*(Footnote Continued Next Page)*

Harris and Singletary. ***See Palmer***, ***supra***. Indeed, Officer Taylor testified that "after I learned that [the vehicle was improperly registered, Harris' driver's license was suspended, and Singletary had no driver's license], I asked [Harris] to exit the vehicle so I can check [] him for any weapons or any more contraband that he may have on them [sic]." N.T. Suppression Hearing, 7/31/20, at 16; ***cf. Palmer***, ***supra*** at 174 (officer ordered passengers out of vehicle so that vehicle could be towed because of traffic infraction).[20] Here, because the Mercedes was turned off and legally parked throughout the interaction, the officers effected a new seizure of Singletary's person—which investigative detention must be supported by new reasonable suspicion—when the officers asked Singletary to alight from the Mercedes, especially after discovering no outstanding warrants, Vehicle Code violations,

_____

here, the Mercedes never moved and remained legally parked throughout police observation.

[20] Here, there were no grounds to tow the Mercedes since it was parked legally, was not impeding the flow of traffic, and no one witnessed Harris, or anyone, drive it. ***Cf. Commonwealth v. Lagenella***, 83 A.3d 94, 101 (Pa. 2013) ("[A]n officer who stops a vehicle **operated** by a person whose driving privilege is, *inter alia*, suspended, is faced with two options: immobilize the vehicle in place or, if it poses public safety concerns, have it towed and stored at an impound lot.") (emphasis added); ***see also*** 75 Pa.C.S.A. § 6309.2(a)(1), (2) (requiring police to immobilize or tow vehicle that is (1) operated by unlicensed driver or (2) operated without valid registration); ***id.*** § 1786(e)(1) ("An owner of a motor vehicle who ceases to maintain financial responsibility on a registered vehicle **shall not operate or permit operation** of the vehicle in this Commonwealth until proof of the required financial responsibility has been provided to the Department of Transportation.") (emphasis added).

or reports of the Mercedes' theft, as the officers retained Singletary's identification. **See Reppert**, **supra**.

Next, we address whether the officers had reasonable suspicion at the time Singletary was seized, and again conclude that the officers lacked reasonable suspicion since Officer Taylor failed to articulate specific observations that led him reasonably to conclude that **criminal activity was afoot** and that **Singletary was involved** in that activity.[21]  **See Fulton**, **supra**.  Here, there was no evidence that Singletary was connected to any of the Commonwealth's evidence.  Indeed, the empty amber pill bottle[22] was seen **in Harris' lap** and the individuals who were standing on the street near

_____

[21] Unlike in **McCree**, **supra**, the incriminating nature of the pill bottle in this case was not immediately apparent.  **Id.** at 625.  In **McCree**, police observed the defendant attempt to hide a Xanax pill bottle under his seat cushion, which factor was essential to the Court's analysis.  Additionally, the police officers in **McCree** specifically suspected that the defendant was connected to the sale of Xanax because officers purchased Xanax pills from another individual, and when officers asked for more Xanax, that individual agreed to procure more, walked to the defendant's vehicle, sat in the passenger seat, and talked to the defendant, who was in the driver's seat.  Here, since there was no specific evidence that the empty amber pill bottle ever contained contraband, and no other circumstances demonstrated, immediately, that the pill bottle was incriminating in nature, we find **McCree** distinguishable from the instant facts.

[22] Singletary's connection to the empty pill bottle is seemingly that he was in the Mercedes at the same time that the bottle was discovered in Harris' lap.  Nevertheless, here, there was no evidence, aside from the label, that the empty amber pill bottle was immediately incriminating, **see McCree**, **supra**, or that it ever contained anything, let alone any contraband.  Indeed, the pill bottle's label did not bear Singletary's name and Singletary was not the claimed owner of the Mercedes or the pill bottle.  Without more, Singletary's weak connection to the bottle, and any criminal activity—including open-air drug dealing—was a mere hunch.  **See Beasley**, **supra**.

the Mercedes—who left[23] when Officer Taylor arrived—**had no other connection than standing nearby**. Merely because the area had a documented, on-going, open-air drug dealing problem is not enough to create a reasonable suspicion, under these facts, that criminal activity was afoot, and that Singletary was involved.[24] *See In re T.W.*, 22 EAP 2020, at *31 n.5 (Pa.

---

[23] Officer Taylor testified that:

> [T]here w[ere] several individuals . . . on [the] 800 block of Hughes Street just hanging out. I don't know what exactly they were doing, but they were just hanging out there when I arrived. I parked my vehicle to get out to advise them. Several members [] of that group had left before I could talk to them. They just left in different directions.

N.T. Suppression Hearing, 7/31/20, at 9. We discern no connection between the group and Singletary or Harris where Officer Taylor did not mention one.

[24] A police officer's characterization of a high crime area must still bear some connection to the defendant. *See Commonwealth v. Brown*, 507 EDA 2019, at *16 (Pa. Super. 2020) (unpublished memorandum decision) ("Being in a 'high crime' or 'high gun' neighborhood at 9:50 p.m. does not indelibly brand everyone in that neighborhood as a danger to police or others. And as the public defender correctly argued in her closing, "if we use high crime, high drug, we would be frisking every single person that's in the City and County of Philadelphia." Thus, while the police's characterization of a neighborhood may enhance suspicion if tied to some specific conduct by the frisked individual, it does not carry much weight in and of itself. Also, 9:50 p.m. is not so late to be driving in a major metropolitan center, such as Philadelphia, that to do so leads to a reasonable belief that the car's occupants are armed and dangerous.") (internal citation omitted); *see also* Pa. IOP Super. Ct. 65.37(B) ("Non-precedential decisions filed after May 1, 2019, may be cited for their persuasive value, pursuant to Pa.R.A.P. 126(b).").

Indeed, Officer Taylor testified that "it's not illegal to sit in a parked car with a suspended license." N.T. Suppression Hearing, 7/31/20, at 30. Perhaps it goes without saying that it is also not a crime to sit it in an unregistered legally parked vehicle without a license to drive it.

filed Oct. 20, 2021) ("We acknowledge a suspect's mere presence in a high crime area is not sufficient by itself to support reasonable suspicion. However, presence in a high crime area may be considered in examining the totality of the circumstances.") (citations omitted). Officer Taylor's hunch and unparticularized suspicion regarding Singletary is not enough to support the request to exit the vehicle under either of the Commonwealth's theories. **See Beasley**, **supra**.

Consequently, the gun that police discovered and seized during this unconstitutional search is the fruit of the poisonous tree, which the court correctly suppressed. **See Wong Sun**, **supra**.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 12/17/2021