J-S01035-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| | : | |
| ZAHEER RASHEED | : | No. 775 MDA 2021 |

Appeal from the Suppression Order Entered June 4, 2021
In the Court of Common Pleas of Luzerne County Criminal Division at
No(s): CP-40-CR-0001026-2020

BEFORE: BOWES, J., NICHOLS, J., and COLINS, J.[*]

MEMORANDUM BY COLINS, J.: **FILED: AUGUST 16, 2022**

The Commonwealth appeals from the order granting the motion of Appellee, Zaheer Rasheed, to suppress evidence seized during a search of his vehicle and person. The Commonwealth contends that the suppression court erred by finding that officers lacked reasonable suspicion to approach Appellee's vehicle to engage in an investigative detention. In the alternative, the Commonwealth argues that officers were authorized to remove Appellee from his vehicle and frisk him based upon safety concerns. We affirm.

The following facts were revealed at the November 9, 2020 suppression hearing at which Officers Frank Oatridge and Timothy Minnick of the Plains Township Police Department testified. At approximately 3:00 a.m. on March 14, 2018, Officer Oatridge was parked in a parking lot across from the Red

_____

[*] Retired Senior Judge assigned to the Superior Court.

Roof Inn when he observed a vehicle with two or more passengers pull into the parking lot of the hotel and pull out approximately three or four minutes later. N.T., 7/9/20, at 5-7. From Officer Oatridge's vantage point, he could only see the entrance of the parking lot, and he could ascertain whether anyone exited the vehicle while parked at the Red Roof Inn. *Id.* at 11.

Deeming the vehicle's activity suspicious in light of the extensive drug activity in the vicinity of the Red Roof Inn, Officer Oatridge followed the vehicle along State Route 315 to the Microtel Inn and Suites, another establishment known for drug activity. *Id.* at 6-8. Officer Oatridge, who parked at an establishment across the street from the Microtel, observed that the vehicle remained parked in the Microtel parking lot, with no one entering and exiting, for approximately 20 minutes. *Id.* at 7-8.

While maintaining surveillance, Officer Oatridge called his partner, Officer Minnick, to join him and discuss their next steps; in their separate patrol cars, the officers entered the Microtel parking lot with their lights and sirens off and parked behind the vehicle, although not blocking its exit to back out. *Id.* at 8-9, 22-24, 32, 39-41. The officers advanced towards the vehicle on foot without drawing their weapons; as they approached, they observed Appellee, the driver, glancing in the sideview mirror and "making furtive movements towards the center console." *Id.* at 9, 25, 40-41, 47. Officer Minnick, who had approached on the driver's side, then removed Appellee

from the vehicle.[1]  ***Id.*** at 9, 27-28.  Officer Minnick patted him down and felt a plastic bag with a rock-like object inside a jacket pocket that was consistent with crack cocaine; when he removed the bag from Appellee's jacket, Officer Minnick determined that the object was in fact crack cocaine.  ***Id.*** at 42-43. Officer Minnick then handcuffed Appellee and asked him for consent to search the vehicle.  ***Id.*** at 30, 43, 49.  Appellee consented to the search and additional packaged drugs were found in the vehicle, including methamphetamine.  ***Id.*** at 30, 43-44, 50.

When asked the rationale for making contact with the vehicle, Officer Oatridge explained that he and Officer Minnick "felt [that the behavior of Appellee, as the operator of the vehicle, was] suspicious for the time of day, the fact that he was at a previous hotel for three minutes, pulled into another hotel, and sat in his vehicle for approximately 20 minutes." ***Id.*** at 18.  Officer Oatridge also stressed that the vicinity of the Red Roof Inn and Microtel was a "[h]igh crime area, known for drugs and drug overdoses." ***Id.*** at 34.  Officer Minnick concurred that, in light of his training with identification of drugs and

---

[1] We note that this presents the only significant conflict in the suppression hearing testimony of Officer Oatridge and Officer Minnick.  Officer Oatridge testified that his partner removed Appellee from the vehicle, while Officer Minnick stated that, upon his request, Appellee voluntarily exited the vehicle. N.T., 7/9/20, at 9, 27-28, 41-42, 47-49, 58.  The suppression court noted this conflict and found that Officer Minnick pulled Appellee out of the vehicle. Order, 6/4/21, Finding of Fact ¶9.  Because the record contains support for the suppression court's finding that Officer Minnick removed Appellee from his vehicle, we are bound by it. ***See Commonwealth v. Adams***, 205 A.3d 1195, 1197 n.2 (Pa. 2019); ***Commonwealth v. Richard***, 238 A.3d 522, 525 (Pa. Super. 2020).

- 3 -

his experience with drug arrests, he believed that the behavior of the occupants of the vehicle was "indicative of drug activity." *Id.* at 37-40, 52-53. Officer Minnick stated that he initiated the removal of Appellee from the vehicle and the pat-down as a result of his "nervous[ness]" and reaching into the center console, which Officer Minnick deemed to be "an officer safety issue." *Id.* at 41, 47-48, 58.

On April 23, 2020, an information was filed charging Appellee with one count of possession with intent to deliver a controlled substance - methamphetamine.[2] On August 10, 2020, Appellee filed an omnibus pre-trial motion seeking the suppression of the evidence gathered from Appellee and his vehicle because the officers lacked reasonable suspicion or probable cause to detain him. On June 4, 2021, following a hearing and the submission of briefs, the suppression court entered an order, with supporting findings of fact and conclusions of law, granting the suppression motion.

The suppression court concluded that the interaction between Appellee and the officers constituted a seizure as "there was never occasion for a mere encounter." Order, 6/4/21, Conclusion of Law ("C.L.") ¶10. The court found instead that Appellee was subjected to an investigative detention based upon the officers' rapid approach on both sides of the vehicle without making any efforts to speak to Appellee. *Id.*, C.L. ¶¶10, 13-14. The suppression court determined that, "[i]n a matter of seconds," the contact then "escalated from

_____

[2] 35 P.S. § 780-113(a)(30).

an investigative detention to a custodial detention" when Officer Minnick removed Appellee from his vehicle "in the absence of any attempt to speak with" Appellee. *Id.*, C.L. ¶10.

The suppression court determined that Appellee's investigative detention was not supported by reasonable suspicion that criminal activity was afoot. *Id.*, C.L. ¶¶12, 15. The court noted that the officers did not observe any actions by Appellee that were "inconsistent with innocent, lawful conduct" and the officers' belief that Appellee was engaged in drug activity "evince[d] nothing more than a 'hunch'" rather than reasonable suspicion based upon specific articulable observations. *Id.*

The suppression court further found that the officers' testimony of Appellee's "nervous" appearance and "furtive movements" towards the center console did not provide justification for the heightened level of scrutiny to which Appellee was subjected. *Id.*; *see also* N.T., 7/9/20, at 9, 25, 40, 47. The court reasoned that the act of glancing nervously in the sideview mirror "after two police cruisers—or any vehicles for that matter—appeared at approximately 3:00 a.m. in a hotel parking lot is not[] unusual conduct." Order, 6/4/21, C.L. ¶12. "Indeed," the court continued, "it is hard to imagine anyone would not glance into a rearview mirror or, in the alternative, turn to see who was approaching when two vehicles parked to the rear of his/her car." *Id.* The court also concluded that Appellee's furtive movements, in which he appeared to be putting something in or taking something out of the center

console, were "entirely consistent with innocent activity, especially in the absence of any prior observations of criminal activity." *Id.*

Finally, the suppression court noted that, even to the extent Officer Minnick may have believed that Appellee had access to a gun in his vehicle, carrying a firearm is not inherently illegal in Pennsylvania and cannot support a finding that Appellee constituted a threat to the officers' safety that justified the officers' actions. *Id.*, C.L. ¶10 (citing *Commonwealth v. Hicks*, 208 A.3d 916, 937 (Pa. 2019)). Having found that Officer Minnick was not lawfully in a position to conduct the frisk of Appellee that uncovered contraband, the court granted Appellee's motion and suppressed all evidence obtained after Appellee's illegal seizure. *Id.*, C.L. ¶16.

The Commonwealth filed a timely appeal from the order granting Appellee's suppression motion. Before this Court, the Commonwealth raises the following issue:

> Whether the [suppression] court erred by granting [Appellee's] suppression motion when it incorrectly found that Officer Oatridge could not identify the car and that officers did not have reasonable suspicion/probable cause to approach [Appellee's] car, ask that he get out of the car, pat him down, and consent to a search of the car?

Commonwealth Brief at 4.

On appeal from the grant of a suppression order, we apply the following standards:

> When the Commonwealth appeals from a suppression order, we follow a clearly defined standard of review and consider only the evidence from the defendant's witnesses together with the

- 6 -

evidence of the prosecution that, when read in the context of the entire record, remains uncontradicted. The suppression court's findings of fact bind an appellate court if the record supports those findings. The suppression court's conclusions of law, however, are not binding on an appellate court, whose duty is to determine if the suppression court properly applied the law to the facts.

***Commonwealth v. Richard***, 238 A.3d 522, 525 (Pa. Super. 2020) (citation omitted).

The Commonwealth argues that the suppression court erred in granting Appellee's suppression motion as the officers' contact with Appellee's vehicle was a mere encounter. The Commonwealth asserts that once they saw Appellee's furtive movements, and in light of the time of night and the fact that they were in a high crime area, reasonable suspicion arose to remove Appellee from the vehicle[3] and pat him down for weapons. According to the Commonwealth, upon the discovery of crack cocaine in Appellee's pocket, the officers had probable cause to arrest Appellee and seek consent to search the vehicle.

Even to the extent reasonable suspicion was necessary to support the initial approach of the vehicle, the Commonwealth contends that the officers

_____

[3] The Commonwealth argues that Officer Minnick was constitutionally authorized to "ask [Appellee] to get out of the vehicle" and then pat him down. Commonwealth Brief at 10. However, as discussed above, the suppression court resolved the conflict between the officers' testimony in favor of Officer Oatridge, who testified that Officer Minnick pulled Appellee from the vehicle. Order, 6/4/21, Finding of Fact ¶9. As this finding is supported by the record, we may not revisit it on appeal. ***See Adams***, 205 A.3d at 1197 n.2 (concluding that Court was bound by suppression court's factual finding regarding officer's observation during vehicle stop that found support in the record and rejecting Commonwealth's argument to the contrary).

possessed the requisite level of suspicion to detain Appellee in the Microtel parking lot. The Commonwealth points to observations by the officers that led to them making contact with Appellee: the brief visit to the Red Roof Inn, a hotel known for drug activity, the travel to the Microtel, another hotel known for drug activity, and then the occupants remaining in the parked car at the Microtel for a period of 20 minutes without exiting. The Commonwealth asserts that these observations, when taken together, allowed the officers to reasonably conclude that criminal activity was afoot.

"The Fourth Amendment to the United States Constitution and Article I, Section 8 of the Pennsylvania Constitution guarantee the right of the people to be secure in their persons, houses, papers, and possessions from unreasonable searches and seizures." *Commonwealth v. Thomas*, 273 A.3d 1190, 1195 (Pa. Super. 2022). "Not every encounter between a law enforcement officer and a citizen constitutes a seizure warranting constitutional protections." *Commonwealth v. Adams*, 205 A.3d 1195, 1199 (Pa. 2019). "Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred." *Id.* (citation omitted).

Interactions between police and members of the public are classified into three categories: mere encounters, investigative detentions, and custodial detentions. *Id.* at 1199-1200; *Commonwealth v. Dix*, 207 A.3d 383, 388 (Pa. Super. 2019). A mere encounter, sometimes referred to as a consensual encounter, can be any formal or informal interaction between an

officer and citizen and does not need to be justified by any level of police suspicion. **Adams**, 205 A.3d at 1199; **Dix**, 207 A.3d at 388. In a mere encounter, "the citizen is free to choose whether to engage with the officer and comply with any requests made or, conversely, to ignore the officer and continue on his or her way." **Adams**, 205 A.3d at 1199. An investigative detention "carries an official compulsion to stop and respond" and must be supported by reasonable suspicion of unlawful activity. **Dix**, 207 A.3d at 388 (citation omitted). Finally, a custodial detention, which must be based upon probable cause that the individual has committed or is committing a crime, occurs "when the nature, duration and conditions of an investigative detention become so coercive as to be, practically speaking, the functional equivalent of an arrest." **Dix**, 207 A.3d at 388 (citation omitted).

Unlike a mere encounter, an investigative detention constitutes a seizure of a person, which requires that the police officer have at least a reasonable suspicion that criminal activity is afoot. **Adams**, 205 A.3d at 1199-1200; **Thomas**, 273 A.3d at 1196.

> Reasonable suspicion exists only where the officer is able to articulate specific observations which, in conjunction with reasonable inferences derived from those observations, led him reasonably to conclude, in light of his experience, that criminal activity was afoot and that the person he stopped was involved in that activity. Therefore, the fundamental inquiry of a reviewing court must be an objective one, namely, whether the facts available to the officer at the moment of intrusion warrant a [person] of reasonable caution in the belief that the action taken was appropriate.

**Thomas**, 273 A.3d at 1196 (citation omitted).

- 9 -

When evaluating the level of interaction between law enforcement and a citizen to determine whether a seizure occurred, "courts conduct an objective examination of the totality of the surrounding circumstances." *Commonwealth v. Lyles*, 97 A.3d 298, 302 (Pa. 2014). "The test, often referred to as the free to leave test, requires the court to determine whether, taking into account all of the circumstances surrounding the encounter, the police conduct would have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business." *Adams*, 205 A.3d at 1200 (citation and internal quotation marks omitted).

"The totality-of-the-circumstances test is ultimately centered on whether the suspect has in some way been restrained by physical force or show of coercive authority." *Lyles*, 97 A.3d at 302. No single factor controls the ultimate conclusion of whether a seizure occurred; "[w]hat constitutes a restraint on liberty prompting a person to conclude that he is not free to 'leave' will vary, not only with the particular police conduct at issue, but also with the setting in which the conduct occurs." *Id.* at 302-03 (citation omitted).

Our Supreme Court has indicated that reviewing courts must view "'all circumstances evidencing a show of authority or exercise of force, including the demeanor of the police officer, the manner of expression used by the officer in addressing the citizen, and the content of the interrogatories or statements' when determining whether an officer's conduct is a mere encounter with a citizen or amounts to a seizure." *Thomas*, 273 A.3d at 1199 (quoting *Commonwealth v. Mendenhall*, 715 A.2d 1117, 1119 (Pa. 1998)).

Among the non-exhaustive list of factors relevant to this inquiry are "[t]he number of officers present during the interaction; whether the officer informs the citizen they are suspected of criminal activity; the officer's demeanor and tone of voice; the location and timing of the interaction; the visible presence of weapons on the officer; and the questions asked." *Id.* (citation omitted).

Upon review, we agree with the suppression court that there was no opportunity for the officers of the Plains Township Police Department to engage in a mere encounter with Appellee and instead it was an investigative detention from the outset. The record reveals that the officers initiated contact by parking in their respective police cruisers in the area behind Appellee's car and immediately exiting and approaching on foot, with one officer on either side of the suspect vehicle. No initial attempt was made at verbal contact with Appellee or the other occupant of the vehicle; instead, Officer Minnick summarily removed Appellee from his vehicle and then began to pat him down to search for contraband. A reasonable person in Appellee's place would not have felt free to leave at the moment the officers made contact with his vehicle. *See Adams*, 205 A.3d at 1197, 1200-02 (officer's action in approaching a vehicle parked in a business parking lot at 3:00 a.m. and shutting the door on Adams, the occupant, as he attempted to open the door to exit constituted a seizure under the Fourth Amendment; "there was no interaction, let alone conversation, between [the officer] and Adams before the officer prohibited Adams from exiting his vehicle"); *Commonwealth v. Singletary*, 267 A.3d 1267, 1277 (Pa. Super. 2021) (mere encounter became

- 11 -

investigative detention when officers approached vehicle parked on street in high-crime area, "stood on each side of the [vehicle], and requested the occupants to alight from the vehicle, all while the occupants' identifications remained in police possession"); *Commonwealth v. Rohrbach*, 267 A.3d 525, 527-28 (Pa. Super. 2021) (officers seized defendant when they approached his vehicle parked near a closed business during early morning hours, shined headlights into vehicle, and honked as defendant began to back away).[4]

We therefore must ascertain whether the officers identified "specific and articulable facts" at the suppression hearing that would allow them to believe, in light of their training and experience, that criminal activity was afoot within Appellee's vehicle. *Adams*, 205 A.3d at 1205 (citation omitted). On the record established at the hearing, we concur in the suppression court's determination that the Commonwealth did not make such a showing. Officers Oatridge and Minnick suspected that Appellee was engaged in criminal activity based solely upon the fact that he visited one hotel associated with drug

---

[4] Appellee urges this Court to go further than the suppression court and find that the interaction was an investigative detention at the moment that the officers parked their vehicles in the area behind Appellee's car. We do not so rule. While this Court has found that an investigative detention commenced at the moment an officer pulled his or her vehicle directly behind and blocking the defendant's exit, *see, e.g.*, *Commonwealth v. Hampton*, 204 A.3d 452, 458-59 (Pa. Super. 2019); *Commonwealth v. Mulholland*, 794 A.2d 398, 401-02 (Pa. Super. 2002), the testimony here showed that the officers did not park in such a way to block Appellee from reversing out of his parking space if he had chosen to do so. N.T., 7/9/20, at 32-33. Moreover, the officers did not approach with their sirens on. *Id.* at 9.

activity, the Red Roof Inn, and then drove to another hotel with the same reputation, the Microtel, and parked in its parking lot for twenty minutes. There is no evidence that Appellee or the passenger of his vehicle had any contact with any other individual in either location that may have been indicative of a drug transaction. Furthermore, because the vehicle was not visible during the three or four minutes during which Appellee was present at the Red Roof Inn, it was unknown whether Appellee remained in his car the entire time, went into hotel reception to see if a room was available, or simply turned around and left after seeing a "No Vacancy" sign. Similarly, Appellee remaining in his parked car in the Microtel parking lot for 20 minutes was not indicative of criminal activity. Thus, the officers' suspicion that Appellee was engaged in criminal activity was based only upon his mere presence at two sites associated with drugs, rather than any indicia that Appellee himself had engaged in any illegal act. *Cf. Commonwealth v. Brame*, 239 A.3d 1119, 1132 (Pa. Super. 2020) (investigative detention of defendant sitting in parked vehicle was justified where officers observed actual exchange of money and suspected drugs with driver of another vehicle, the parties to the transaction did not engage in any conversation, parking lot was known for drug activity, and vehicle registrations fit parameters of previously known drug dealers and buyers).

The sole remaining factors cited by the officers as raising their suspicions were Appellee's "nervous" glances in the sideview mirror and his "furtive movements" towards the center console of his vehicle. Like the

suppression court, we cannot find these actions supported reasonable suspicion of Appellee's criminality. It is difficult to imagine who would not glance around nervously when being suddenly approached by two unknown individuals on foot while parked in a parking lot at 3:00 a.m.[5] Moreover, Appellee's furtive movements lend little support to the officers' determination that crime was afoot, particularly where there was no testimony that officers had already observed Appellee handling objects consistent with drugs or paraphernalia or having engaged in a hand-to-hand transaction. There are any number of innocent explanations for Appellee's movements towards the center console, such as reaching for his driver's license or vehicle registration, attempting to access his keys to start his car and quickly drive away, or seeking to place a lawfully carried firearm in a position that was not deemed threatening in an interaction with the police. We further agree with the suppression court's observation that a citizen's furtive movements after being startled by approaching officers in the middle of the night has little value as predictor of criminal behavior.[6]

_____

[5] While the officers were in uniform at the time of their approach it is not clear whether Appellee would have immediately realized that they were police officers in light of the time of night, their decision to approach without using lights and sirens and not park directly behind his car, and the fact that Appellee could only see them through his rearview mirrors.

[6] The suppression court explained its view that

"[F]urtive movement" in the absence of a traditional traffic stop with lights and sirens carries much less significance and should be afforded less weight in support of subsequent police action insofar as the

*(Footnote Continued Next Page)*

- 14 -

We find our Supreme Court's decision in **Commonwealth v. DeWitt**, 608 A.2d 1030 (Pa. 1992), to be instructive in our present analysis. In **DeWitt**, Pennsylvania State Troopers observed a vehicle parked partially in a church parking lot at approximately midnight with its interior lights illuminated. **Id.** at 1031. Based upon concerns that the vehicle was disabled and requests from the church to look for suspicious vehicles on its property, the troopers pulled alongside the vehicle; at that moment, the interior lights of the vehicle were extinguished, the occupants of the vehicle made "furtive movements and suspicious movements as if they were trying to hide something," and the vehicle began to pull away. **Id.** at 1031-32. The troopers then initiated a traffic stop to further investigate, discovering alcohol and drugs in plain view inside the vehicle. **Id.** at 1032.

The trial court in **DeWitt** suppressed the evidence obtained from the vehicle on the basis that the troopers lacked reasonable suspicion for the investigative detention, but this Court reversed, concluding that "[t]he combination of furtive movements, time of night, previous notice from the property owner, potential parking violation, and attempted movement from

_____

movements are more likely innocuous conduct. In other words, somebody who is being pulled over by law enforcement is more likely to be hiding something than somebody who is either unaware they are under surveillance or who is merely approached by law enforcement without the prior notification of lights and sirens and the resulting obligation to stop.

Order, 6/4/21, at 13 n.18.

the scene when the police arrived, sufficiently justified the legality of the stop." *Id.* at 1032, 1034. Our Supreme Court reversed and reinstated the suppression of the evidence, observing that while there were previous reports of criminal behavior in the church parking lot, there was no evidence that the specific vehicle in question was the one engaging in that behavior. *Id.* at 1034 & n.2. In addition, the Court determined that the vehicle's flight alone was insufficient to establish reasonable suspicion of criminal conduct. *Id.* at 1034.

Our Supreme Court relied on *DeWitt* in its recent decision in *Adams*, another case involving police late-night observation of a suspicious parked vehicle. In *Adams*, an officer watched a vehicle enter the parking lot for two closed businesses and drive behind the building at approximately 3:00 a.m. 205 A.3d at 1196-97. After waiting to see if the vehicle would leave on its own and recognizing the potential for drug activity or an attempted burglary, the officer drove into the parking area and found the car parked and with the lights off. *Id.* at 1197. The officer pulled behind the vehicle and approached on foot, knocking on the driver's side window; the driver, Adams, attempted to open the door to exit, but the officer pushed the door closed and instructed Adams to remain inside to wait for a backup officer. *Id.* After the other officer arrived, field sobriety tests were performed, and Adams was arrested for driving under the influence. *Id.* at 1198.

The Supreme Court reversed the trial court's denial of suppression of the officer's observations after his initial approach of the vehicle. *Id.* at 1207.

The Court concluded that the time of night and the fact that the vehicle was parked in an atypical location did not support reasonable suspicion that criminal activity was afoot. *Id.* at 1206. The Court additionally noted that, as in *DeWitt*, the suppression record was devoid of any articulated facts that, aside from his presence in a certain place at a certain time, Adams had committed any criminal offense or was about to commit an offense. *Id.*

Another recent decision of this Court involving a vehicle stop under similar circumstances is *Rohrbach*. In that case, the Pennsylvania State Police were engaged in regular patrols of the Freedom Gymnastics parking lot after receiving reports of off-hour criminal activity from the owner of the establishment; in the early morning hours of the date in question, two troopers noticed a vehicle parked in "a not well-lit area" of the lot and approached. 267 A.3d at 527. Concerned that the individual inside may have overdosed and being aware that the parking was known "for high-drug activity," the troopers shined their headlights toward the vehicle to investigate. *Id.* Rohrbach, the sole occupant of the vehicle, noticed the lights and then began to back out of the parking space. *Id.* One of the troopers then initiated a traffic stop by honking at Rohrbach; after smelling cannabis wafting out of the open window of the vehicle and finding a cannabis cigarette, Rohrbach was charged with driving under the influence. *Id.*

The suppression court granted Rohrbach's motion to suppress, and we affirmed. We noted that the "generalized" and "vague reports of random criminal conduct [at Freedom Gymnastics] do not describe the people

- 17 -

supposedly using or selling drugs or anything to identify their vehicles." *Id.* at 529. We explained that such "[n]ebulous reports . . . lack[ed] the particularity required to link [Rohrbach] to a criminal act" even though the parking lot was a known high-crime area and Rohrbach was parked in a darkened area of the lot at a time when the business was closed. *Id.* We thus concluded that the officers lacked reasonable suspicion to conduct their search, stating that to sanction this search as constitutional would "give police a general warrant to stop every car in the parking lot after business hours, without additional observations regarding a particular vehicle that would reasonably indicate that crime was afoot." *Id.* at 529-30.

*DeWitt*, *Adams*, and *Rohrbach* demonstrate that an officer's observation of a vehicle parked late at night in a location consistent with criminal activity does not by itself create reasonable suspicion that the occupant of the vehicle is engaged in that activity. This is true regardless of whether, as in *Adams*, the officer bases his suspicion on experience and intuition, or, as in *DeWitt* and *Rohrbach*, the officers are aware of specific complaints that the parking lot is the locus of the criminal behavior. *See also Singletary*, 267 A.3d at 1280 (individual's presence in on-going, open-air drug market does not establish reasonable suspicion that individual was involved in the criminal activity). Thus, in the present case, the observations by the Plains Township police officers of Appellee's presence at the Red Roof Inn and Microtel, two establishments known for being the site of drug activity,

did not justify the investigative detention.[7]   Furthermore, like in **DeWitt**, Appellee's nervousness and furtive movements upon being surprised by the presence of the officers did not independently support reasonable suspicion that criminal activity was afoot.  **See also Commonwealth v. Morrison**, 166 A.3d 357, 367 (Pa. Super. 2017) ("[T]he fact that [the a]ppellant appeared nervous after the officers stopped and approached him does not provide reasonable suspicion for an investigative detention.").

Accordingly, the suppression court properly found that the officers lacked reasonable suspicion to seize Appellee.  Furthermore, we find no fault in the lower court's determination that Officer Minnick was not authorized to remove Appellee from his vehicle and frisk him based solely upon the officer's concern regarding his safety.  In **Terry v. Ohio**, 392 U.S. 1 (1968), the United States Supreme Court recognized that an officer may conduct a pat down search of an individual to determine whether the individual is armed and presents a danger to the officer.  However, as our Supreme Court explained in **Adams**, the pat down may only take place "**during**" a "brief investigatory detention" that is supported by reasonable suspicion that criminal activity may be afoot.  205 A.3d at 1203 (emphasis in original).  Therefore,

_____

[7] Indeed, unlike **DeWitt**, **Adams**, and **Rohrbach**, the officers' observations were not inconsistent with Appellee being a patron of either of these establishments as the record is devoid of evidence that the Red Roof Inn or Microtel were closed to guests or individuals looking for lodging at the time of Appellee's visit.

[a] "stop and frisk" [is] constitutionally permissible if two conditions are met. First, the investigatory stop must be lawful. That requirement is met in an on-the-street encounter, **Terry** determined, when the police officer reasonably suspects that the person apprehended is committing or has committed a criminal offense. Second, to proceed from a stop to a frisk, the police officer must reasonably suspect that the person stopped is armed and dangerous.

*Id.* at 1204 (quoting **Arizona v. Johnson**, 555 U.S. 323, 326-27 (2009)) (emphasis omitted).

Although an officer's subjective concern for his safety is, of course, a legitimate interest, it does not enter into a Fourth Amendment analysis unless the investigative detention was initially supported by reasonable suspicion of criminal activity. A contrary conclusion would eviscerate the Fourth Amendment since a concern for officer safety is present in nearly all interactions police have with members of the public.

*Id.*

As we have explained above, the officers' testimony did not establish reasonable suspicion of criminal activity that would have justified an investigative detention prior to Officer Minnick's decision to pull Appellee from his vehicle and pat him down. *See id.* at 1203 ("[C]onsiderations of officer safety must be **preceded** by a finding that the individual was lawfully subjected to an investigative detention, i.e., that the officer had reasonable suspicion that criminal activity was afoot.") (emphasis in original). Therefore, the officers' actions in this case did not meet the first prerequisite to support a protective frisk as Appellee's seizure was not based upon the legally mandated level of suspicion. *See id.* at 1204-05 (officer was not justified in seizing defendant by forcing him to remain inside parked vehicle until back-

up arrived based solely upon officer's safety concerns as the seizure was not supported by finding of reasonable suspicion of criminal activity).

The Commonwealth draws our attention to our decision in **Commonwealth v. Simmons**, 17 A.3d 399 (Pa. Super. 2011), where this Court found that officers were authorized to pat down the occupant of a vehicle after noticing him engaging in furtive movements upon their approach of the vehicle on foot.[8] However, in that case it was undisputed that the vehicle was already subject to a valid traffic stop pursuant to a violation of the Vehicle Code, and therefore there is no question that the officers had a lawful basis for the seizure prior to engaging in the pat down. **See id.** at 403-04 (stating that "furtive movements, **when witnessed within the scope of a lawful traffic stop**, [may] provide[] a reasonable basis for a protective frisk") (emphasis added); **see also Commonwealth v. Brown**, 64 A.3d 1101, 1105 (Pa. Super. 2013) (police officer must have either reasonable suspicion or probable cause of a Vehicle Code violation in order to engage in a traffic stop, with the level of suspicion depending on the nature of the violation). Here, officers did not have legal authority to conduct a stop of Appellee and they

_____

[8] We note that, in **Simmons**, the officer testified that he observed the defendant "reach down towards the floor and then reach across his chest," in a manner "consistent with concealing a weapon." 17 A.3d at 404. Here, by contrast, the officers' testimony did not establish that Appellee's furtive movements were indicative of an attempt to access or conceal a weapon of any kind nor did the officers identify any specific and articulable facts that Appellee presented any threat aside from the location of the vehicle and the time of night. Order, 6/4/21, C.L. ¶10.

could not rely on safety concerns in order to pull him out of the car and frisk him.

Accordingly, because the officers did not have the requisite level of suspicion to seize Appellee, the crack cocaine discovered on Appellee during his pat down, as well as the additional contraband found during the consensual search of the vehicle, were properly suppressed. *See Commonwealth v. Anderson*, ___ A.3d. ___, 2022 PA Super 95, at \*14 (Pa. Super. May 25, 2022) (*en banc*) (where officers did not have requisite level of suspicion to effectuate seizure, appellant's consent to the search was vitiated by the taint of the immediately preceding illegal detention); *Rohrbach*, 267 A.3d at 530 (all police observations and evidence uncovered after unlawful seizure was fruit of the poisonous tree that must be suppressed pursuant to the exclusionary rule).

Order affirmed.

Judge Bowes concurs in the result.

Judge Nichols concurs in the result.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 08/16/2022