J-S23024-21

2021 PA Super 254

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| v. | : | |
| | : | |
| JACOB SCOTT ROHRBACH | : | No. 140 EDA 2021 |

Appeal from the Order Entered January 6, 2021,
in the Court of Common Pleas of Monroe County,
Criminal Division at No(s): CP-45-CR-0000728-2020.

BEFORE:   LAZARUS, J., KUNSELMAN, J., and COLINS, J.*

OPINION BY KUNSELMAN, J.:                    **FILED DECEMBER 21, 2021**

The Commonwealth appeals as of right from the order suppressing its evidence against Jacob Scott Rohrbach and granting him a Writ of *Habeas Corpus*. The Commonwealth fails to persuade us that police had reasonable suspicion for an investigative detention of Mr. Rohrbach. Thus, we affirm.

In the early morning hours of October 10, 2019, Mr. Rohrbach left Anytime Fitness and stopped at a Wawa's in Brodheadsville, Pennsylvania to grab a post-workout meal. He then drove to the empty parking lot of Freedom Gymnastics, parked away from the closed building, and began eating.

That parking lot was known "for high-drug activity, and the owner of [Freedom Gymnastics] has called the police about vehicles parking in the lot." Trial Court Opinion, 1/6/21, at 2. Thus, the state police regularly patrolled it. However, the owner made no report of crime on the date in question, and he never described Mr. Rohrbach or his vehicle to the police.

_____

* Retired Senior Judge assigned to the Superior Court.

Two state police officers, in a marked cruiser, drove into the parking lot and saw Mr. Rohrbach's taillights ahead of them. Mr. Rohrbach had parked in "a not well-lit area." N.T., 9/24/20, at 11. As recorded on the trooper's dashboard camera, the state police approached Mr. Rohrbach from his rear, passenger side; Mr. Rohrbach's car faced forward into the parking spot. *See* Commonwealth's Ex. 2. Given the gym owner's reports, the troopers were concerned "there may be someone overdosed or just maybe somebody that needed help." N.T., 9/24/20, at 11-12. Therefore, they were "approaching the vehicle in order to mere-encounter the operator." *Id.* at 12.

When the troopers' headlights illuminated the inside of Mr. Rohrbach's car, he looked in their direction. After a short pause, Mr. Rohrbach started to back out of the parking sport and turned his car as if to leave the area. *See* Commonwealth's Ex. 2. The trooper "instinctively honked [his] horn." N.T., 9/24/20, at 12.

Mr. Rohrbach instantly stopped his car, and the troopers alighted from their cruiser. They walked to the other vehicle and smelled cannabis wafting from an open window. After having Mr. Rohrbach exit his car, they searched it and found a cannabis cigarette. Mr. Rohrbach made inculpating statements and failed field sobriety tests. The police arrested him, and a blood-draw revealed THC in his system. The Commonwealth charged Mr. Rohrbach with driving under the influence of cannabis ("DUI") and related offenses.[1]

---

[1] *See* 35 Pa.C.S.A. § 780-113(a)(16), (13)(i), and (a)(32) and 75 Pa.C.S.A. § 3802(d)(1)(i).

Mr. Rohrbach moved to suppress the seized evidence and petitioned for Writ of *Habeas Corpus*. He contended that, if the court suppressed all of the Commonwealth's evidence, it would be unable to make a *prima facie* case. After a hearing, the suppression court granted Mr. Rohrbach full relief. This timely appeal followed.

The Commonwealth asks whether the suppression court "erred by concluding that [the police] lacked reasonable suspicion for an investigative detention of [Mr. Rohrbach]?" Commonwealth's Brief at 4.

When reviewing an order granting suppression, our scope of review only includes "the evidence of the defendant's witnesses and so much of the evidence for the prosecution as read in the context of the record as a whole remains uncontradicted." ***Commonwealth v. Lindblom***, 854 A.2d 604, 606 (Pa. Super. 2004). Where, as here, police invaded the privacy of an individual without a warrant, we review whether they possessed reasonable suspicion or probable cause *de novo*. ***See Ornelas v. United State***, 517 U.S. 690 (1996).

The Commonwealth argues the suppression court erroneously ignored "criminal activity that [was] occurring or [had] occurred, [*i.e.,*] the suspicious vehicles reported by the business owner of the Freedom Gymnasium that appeared to be [engaged] in some type of drug activity." ***Id.*** at 13. The Commonwealth believes that the owner's prior reports, coupled with the fact that Mr. Rohrbach was parked in a dark section of the gym's parking lot at 1:15 a.m., and that the vehicle began to back up when the police cruiser approached, gave rise to reasonable suspicion that criminal activity was afoot.

It additionally states, "there was an odor of [cannabis] in the area of the vehicle that [the trooper] could only observe once he exited his patrol vehicle." *Id.* at 14.

The suppression court found that, when the troopers honked their horn at Mr. Rohrbach, they seized him for an investigative detention, commonly known as a ***Terry*** stop.[2]  Under the Fourth Amendment to the Constitution of the United States, police may initiate a ***Terry*** stop based upon reasonable suspicion that the seized individual is involved in criminal activity.  ***See Terry v. Ohio***, 392 U.S. 1, 30 (1968).  "Pennsylvania courts have consistently followed ***Terry*** in stop-and-frisk cases, including those in which the appellants allege protections pursuant to Article I, § 8 of the Pennsylvania Constitution." ***In re D.M.***, 781 A.2d 1161, 1163 (Pa. 2001); ***see also Commonwealth v. Jefferson***, 853 A.2d 404 (Pa. Super. 2004) (accord).  Thus, Article I, § 8 provides citizens no greater protections from ***Terry*** stops than the Fourth Amendment.

"In order to determine whether the police had a reasonable suspicion [when they executed a ***Terry*** stop], the totality of the circumstances — the whole picture — must be considered." ***D.M.***, ***supra***, *citing **United States v. Cortez**,* 449 U.S. 411, 417 (1981).  "Based upon that whole picture, the detaining officers must have a ***particularized*** and objective basis for

---

[2] The Commonwealth agreed with Mr. Rohrbach and the suppression court that the police initiated a ***Terry*** stop when they honked their horn and thereby stopped him from driving away.  ***See*** Commonwealth's Memorandum of Law, 10/15/20, at 2.

suspecting the **particular** person stopped of criminal activity." **Id.** at 417–18 (emphasis added). "[I]n determining whether the officer acted reasonably . . . due weight must be given, not to his inchoate and unparticularized suspicion or 'hunch,' but to the specific reasonable inferences which he is entitled to draw from the facts in light of his experience." **Terry**, 392 U.S. at 27.

Here, there was nothing particularized about the reports upon which the state police relied when they initiated their **Terry** stop of Mr. Rohrbach's car. The troopers only knew that the owner of Freedom Gymnastics had made generalized reports of cars in the parking lot and that he believed the people in those cars were engaged in some sort of drug activity.

These vague reports of random criminal conduct do not describe the people supposedly using or selling drugs or anything to identify their vehicles. Thus, the owner's reports extend to any car in the parking lot, including the state police's patrol car. The troopers' vehicle was in the darkened section of the empty parking lot, in the wee hours of the morning, when the gymnasium was closed. Thus, there is as much likelihood that their car (or anyone else's) fit the owner's reports. On these facts, no one had reasonable grounds to stop the troopers' cruiser for an investigative detention, any more than the troopers had reasonable grounds to stop Mr. Rohrbach for one.

Nebulous reports, like those at bar, lack the particularity required to link anyone to a criminal act. **See Cortez**, **supra**. They may well support the troopers' factual assertion that this case occurred in a high-crime area.

However, they do not give police a general warrant to stop every car in the parking lot after business hours, without additional observations regarding a particular vehicle that would reasonably indicate that crime was afoot. ***See, e.g., Commonwealth v. Adams***, 205 A.3d 1195, 1206-07 (Pa. 2019), *cert. denied* sub nom. ***Pennsylvania v. Adams***, ___ U.S. ___, 140 S. Ct. 2703 (2020) (holding that, when a car is parked in the lot of a closed business in the middle of the night, those facts "alone do not give rise to a finding of reasonable suspicion of criminal activity where the officer provided no specific or articulable facts to suggest that criminal activity is occurring or has occurred.")

Similarly, in ***Commonwealth v. Tither***, 671 A.2d 1156 (Pa. Super. 1996), police were patrolling a high-crime area, notorious for drug trafficking and prostitution, at night, when someone yelled, "5-0! 5-0!" — *i.e.*, "street jargon warning that police were in the area." ***Id.*** at 1157. There was car in front of the officer's cruiser, and a pedestrian was reaching into it. Hearing the warning cry, the pedestrian quickly departed on foot, and the car began to drive away.

The officer believed he had just witnessed a drug deal, so he followed the car, which eventually parked on its own. "The officer stopped behind the [car] and approached on foot. As he arrived at the rear of the vehicle, it started to pull away, so he knocked on the side windows of the vehicle. The defendant stopped the vehicle again." ***Id.*** The officer eventually arrested the driver for DUI.

- 6 -

This Court held that the totality of the circumstances did not amount to reasonable suspicion. "The fact that [Tither] was observed in a high crime area known for drug-related activity is not sufficient to justify a *Terry* stop. Similarly, that [Tither] drove away soon after someone yelled '5–0! 5–0!' is likewise deficient to constitute reasonable suspicion." *Id.* at 1158 (citations omitted). Also, a pedestrian leaning into Tither's car was not criminal conduct, even though this aroused the officer's curiosity that it may have been a drug deal. The *Tither* Court reversed the order denying suppression.

Like the officer in *Tither*, the state police observed Mr. Rohrbach's car pull away from them in a high-crime area. At the time of this observation, the police possessed no particularized basis for inferring that a crime was in progress or had occurred. Even so, they honked their horn and initiated a *Terry* stop. Therefore, we agree with the suppression court: the police lacked reasonable suspicion to detain Mr. Rohrbach when they chose to do so.

Perhaps anticipating our conclusion, the Commonwealth asks this Court, "At what point is [the state trooper] supposed to ignore his observations?" Commonwealth's Brief at 13.

This rhetorical question is unfair. Neither the Fourth Amendment nor *Terry*, *supra*, compel police to ignore their observations. They mandate that police **keep observing** until they (a) see conduct by a particular individual leading to a reasonable suspicion that he or she may be involved in a crime,

(b) have probable cause, or (c) obtain a warrant.[3] Seizing an individual before one of these occurs is a constitutional violation.

In this instance, once the troopers had a hunch that Mr. Rohrbach was DUI or had overdosed, they could have followed him as he drove from the parking lot and through the streets of the town. Had signs of intoxication manifested, there would have been reasonable suspicion for a **Terry** stop. But the troopers elected not to do this. Instead, they prematurely seized Mr. Rohrbach and, therefore, intruded on his privacy without a reasonable basis. This violated the Fourth Amendment.

Accordingly, everything that occurred after the troopers honked their horn (smelling cannabis near Mr. Rohrbach's vehicle, uncovering cannabis in it, administering field sobriety tests, obtaining self-incriminating statements, and drawing Mr. Rohrbach's blood) is the product of the unconstitutional traffic stop. All of the Commonwealth's evidence is fruit of the poisonous tree and must be suppressed under the exclusionary rule. **See Wong Sun v. United**

---

[3] If in doubt, "get a warrant." **Riley v. California**, 573 U.S. 373, 403 (2014). Had the officers obtained a search warrant, we would not have had to second guess their actions with such scrutiny. Instead, we would have deferred to a magisterial district judge's finding of probable cause. **See Illinois v. Gates**, 462 U.S. 213 (1983). Thus, the benefits of a warrant cannot be overstated. In fact, our jurisprudence rewards police (both at suppression hearings and on appeal) for getting one. "The Fourth Amendment demonstrates a 'strong preference for searches conducted pursuant to a warrant,' **Gates, supra,** at 236, and the police are more likely to use the warrant process if the scrutiny applied to a magistrate's probable-cause determination to issue a warrant is less than that for warrantless searches. Were we to eliminate this distinction, we would eliminate the incentive." **Ornelas v. United States**, 517 U.S. 690, 699, (1996).

*States*, 371 U.S. 471 (1963).  Hence, the trial court properly granted Mr.

Rohrbach's Petition for Writ of *Habeas Corpus*.[4]

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 12/21/2021

_____

[4] We note the Commonwealth raised three other issues challenging various findings of additional constitutional violations subsequent to the stop of Mr. Rohrbach's car and the *habeas corpus* relief.  **See** Commonwealth's Brief at 4.  The unconstitutionality of the initial stop and the resultant suppression of the evidence renders those remaining issues moot.