# IN THE SUPREME COURT OF PENNSYLVANIA
# EASTERN DISTRICT

**TODD, C.J., DONOHUE, DOUGHERTY, WECHT, MUNDY, BROBSON, JJ.**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | No. 24 EAP 2022 |
| | : | |
| Appellee | : | Appeal from the Judgment of |
| | : | Superior Court entered on |
| | : | December 21, 2021, at No. 560 |
| v. | : | EDA 2021 (reargument denied |
| | : | February 16, 2022) vacating and |
| | : | remanding the Order entered on |
| KEVIN JACKSON, | : | February 11, 2021, in the Court of |
| | : | Common Pleas, Philadelphia |
| Appellant | : | County, Criminal Division at |
| | : | No. CP-51-CR-0000888-2020 |
| | : | |
| | : | ARGUED: March 8, 2023 |

## OPINION IN SUPPORT OF AFFIRMANCE

**JUSTICE BROBSON**                                   **DECIDED: September 28, 2023**

In this discretionary matter, Appellant Kevin Jackson (Jackson) appeals from the judgment of the Superior Court, which vacated a pretrial order of the Court of Common Pleas of Philadelphia County (suppression court) and remanded the matter for further proceedings. The suppression court granted Jackson's motion to suppress evidence recovered after a police officer detained Jackson via what is commonly known as a *Terry* stop.[1] While the suppression court concluded that the officer lacked the requisite reasonable suspicion to detain Jackson, the Superior Court reached the opposite conclusion. Upon review, we agree with the Superior Court insofar as it concluded that the police officer had reasonable suspicion to detain Jackson under the particular facts of

---

[1] *Terry v. Ohio*, 392 U.S. 1 (1968).

this case. In so doing, we reiterate that an investigatory stop is lawful pursuant to *Terry* if it is supported by reasonable suspicion that the detained individual was, or was about to be, engaged in criminal activity. In making that determination, we review the totality of the circumstances available to the detaining officer at the time of the stop to discern whether there was a particularized and objective basis for suspecting the detained individual of criminal activity. Accordingly, we affirm.

## I. BACKGROUND

On December 10, 2019, at approximately 7:50 p.m., Philadelphia Police Officer Christopher Swinarski (Officer Swinarski) was on routine patrol in a marked vehicle at or near the 4900 block of Penn Street when he heard the sound of two to four gunshots. Officer Swinarski drove his vehicle northbound on Penn Street and then turned westbound onto Harrison Street, making his way to the location from where he believed the gunshots emanated. At that time, Officer Swinarski encountered Jackson running eastbound down Harrison Street on the sidewalk. Officer Swinarski exited his vehicle and asked Jackson why he was running, and Jackson responded that he was running "from the gunshots."[2] (N.T., 2/11/2021, at 17, 21.) At that point, Officer Swinarski commanded Jackson to stop. Jackson did not stop as commanded, however, leading Officer Swinarski to chase him on foot. During the chase, Officer Swinarski observed Jackson discard several items. Officer Swinarski eventually caught up with Jackson and handcuffed him. Thereafter, Officer Swinarski recovered the items Jackson discarded, which included a cell phone and a handgun.[3]

---

[2] The suppression court found that Jackson responded that he was running "because [he] heard gunshots." (N.T., 02/11/2021, at 51.) As correctly noted by the Superior Court, testimony from the suppression hearing reveals that Jackson responded that he was running "from the gunshots." (*Id*. at 17, 21.)

[3] According to the suppression hearing transcript, Officer Swinarski then returned to Jackson and informed him that he was under arrest. (N.T., 02/11/2021, at 18.) Officer (continued…)

Based on the foregoing, the Commonwealth of Pennsylvania (Commonwealth) charged Jackson by criminal information with firearms not to be carried without a license and carrying a firearm in public in Philadelphia without a license.[4] Jackson filed a pretrial motion in the suppression court, seeking to suppress the Commonwealth's evidence by alleging that Officer Swinarski lacked the reasonable suspicion necessary to conduct a lawful *Terry* stop in violation of Jackson's right to be free from unreasonable searches and seizures pursuant to the Fourth Amendment to the United States Constitution and Article 1, Section 8 of the Pennsylvania Constitution.[5]

The suppression court held an evidentiary hearing at which only Officer Swinarski testified. Officer Swinarski generally explained the foregoing events leading to Jackson's apprehension. Of further relevance here, as to his reasoning behind ordering Jackson to stop, Officer Swinarski explained:

> [Officer Swinarski:]  At that point, I told Mr. Jackson to stop.  I gave him multiple verbal commands to stop because I didn't know if he's injured.  He could have been shot, in shock.  He could have [been] a good witness or

---

Swinarski also searched Jackson at that time and discovered 14 vials of suspected marijuana. (*Id.*) Notably, this case concerns only the propriety of Officer Swinarski's initial command to Jackson to stop running.

[4] *See* Sections 6106(a)(1) and 6108 of the Crimes Code, 18 Pa. C.S. §§ 6106(a)(1) and 6108, respectively.

[5] The Fourth Amendment to the United States Constitution provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

Article I, Section 8 of the Pennsylvania Constitution similarly mandates:

> The people shall be secure in their persons, houses, papers and possessions from unreasonable searches and seizures, and no warrant to search any place or to seize any person or things shall issue without describing them as nearly as may be, nor without probable cause, supported by oath or affirmation subscribed to by the affiant.

possibly an offender at that time.  As I approached Mr. Jackson on foot, he fled . . . .

(N.T., 02/11/2021, at 17.)  On cross-examination, Jackson's counsel questioned Officer Swinarski further regarding Jackson running from the gunshots:

[Jackson's counsel:]  He told you he's running from the [gun]shots that you just heard?

[Officer Swinarski:]  Yes.

[Jackson's counsel:]  And you've been a police officer eight years?

[Officer Swinarski:]  That's correct.

[Jackson's counsel:]  And so people begin to shoot and some people run. That's standard?  That's normal, right?

[Officer Swinarski:]  Absolutely.

[Jackson's counsel:]  Normal behavior of people, right?

[Officer Swinarski:]  Yes.

[Jackson's counsel:]  Especially—even—even people who are not involved. When people start shooting, people run, right?

[Officer Swinarski:]  That's correct.

(*Id.* at 26.)  Officer Swinarski also admitted that he did not witness Jackson clutching or holding anything, or reaching toward his waistband or his pockets, nor did he witness Jackson doing anything criminal during the pursuit.  (*See id.* at 26-27, 31-32, 34.)

Officer Swinarski additionally explained that Jackson was not under criminal investigation:

[Jackson's counsel:]  So, anyway, you did tell us that you expected him to acquiesce to your command to stop, which he does not.  He continues to run, right?

[Officer Swinarski:]  He continues to run.

[Jackson's counsel:]  And at that moment, he was—he was free to go.  He wasn't under your investigation for anything.  He was free to go away, wasn't he?

[Officer Swinarski:]  When?

[Jackson's counsel:]  When that gentleman—when this citizen was running down the street, he was not under police investigation for any criminal activity, was he?

[Officer Swinarski:]  For no—for criminal activity, no.

[Jackson's counsel:]  Okay.  And then you began to pursue him, correct?

[Officer Swinarski:]  After he disregarded the stop and continued to run.

[Jackson's counsel:]  And you said stop a few times, right?

[Officer Swinarski:]  Yes.  Multiple times.

(*Id*. at 30-31.)

Officer Swinarski reiterated, however, that he commanded Jackson to stop because he believed that Jackson could have been a victim, witness, or perpetrator:

> [Jackson's counsel:]  If he'd appeared injured, meaning limping or . . . seemed like he was infirmed while he was running, you would have documented that, right?
>
> [Officer Swinarski:]  Absolutely. . . .  [A]t that time, I did not know if he was shot or not.  Like I said, somebody could be in shock.  If they were—if they were—I've seen many people in shock who didn't think they were shot.
>
> [Jackson's counsel:]  I understand that.
>
> [Officer Swinarski:]  But, like I said, he could be—he could be the victim or the witness or possibly an offender at that time.
>
> [Jackson's counsel:]  Or—or, four, he could be nothing and just running from the [gun]shots?
>
> [Officer Swinarski:]  Absolutely.

(*Id*. at 27.)  Officer Swinarski also explained that Jackson was the lone individual on the street at the time.  (*Id.* at 25.)

Based on the foregoing testimony, the suppression court granted Jackson's pretrial motion to suppress the Commonwealth's evidence.  The suppression court announced its factual findings and legal conclusions from the bench:

> [T]he point at which the officer detained the defendant was after they first had their mere encounter.  And the defendant explained his reasons for running and he proceeded to run.  At that point, the officer issued a command for Mr. Jackson to stop.  And that would trigger the investigatory detention standard, which requires that he needed to have a reasonable basis to issue that command to order Mr. Jackson to stop.
>
> I find that on these facts, he did not have reasonable suspicion to detain Mr. Jackson.  I do not find that this was a high-crime area.  I don't believe evidence was on the record to support that determination.  All we have here is an individual on the street, engaging in running, and he—and with good reason because there had been [gun]shots fired.

The officer made every indication that, at [that] point, he had not seen the defendant engaging in any criminal activity, or have any reason to suggest that the defendant had engaged in criminal activity, nor did the officer, at that point, witness the defendant holding any objects or trying to hide any objects. He had no reasonable suspicion to detain Mr. Jackson.

(*Id*. at 51-52.) Accordingly, the suppression court concluded that Officer Swinarski conducted an unlawful *Terry* stop, and it suppressed the firearm and other evidence recovered by Officer Swinarski following the detention.

In a published decision, the Superior Court vacated the suppression court's order and remanded for further proceedings.[6] *Commonwealth v. Jackson*, 271 A.3d 461 (Pa. Super. 2021). Like the suppression court, the Superior Court first recognized that, when Officer Swinarski ordered Jackson to stop running, he commenced an investigative detention under *Terry*, and Officer Swinarski, therefore, required reasonable suspicion that Jackson was involved in criminal activity to detain him. *See id.* at 463-64 (citing *Terry*, 392 U.S. at 30). The Superior Court also noted that "Pennsylvania courts have consistently followed *Terry* in stop and frisk cases, including those in which the appellants allege protections pursuant to Article I, [Section] 8 of the Pennsylvania Constitution." *Id.* at 464 (quoting *In re D.M.*, 781 A.2d 1161, 1163 (Pa. 2001)). Accordingly, the Superior Court opined that Article I, Section 8 provides no greater protections concerning investigative detentions than the Fourth Amendment.[7]

---

[6] The Commonwealth took an interlocutory appeal as of right pursuant to Pennsylvania Rule of Appellate Procedure 311(d) on the basis that the suppression court's ruling substantially handicapped its prosecution. *See* Pa.R.A.P. 311(d) (providing that, "[i]n a criminal case, under the circumstances provided by law, the Commonwealth may take an appeal as of right from an order that does not end the entire case where the Commonwealth certifies in the notice of appeal that the order will terminate or substantially handicap the prosecution").

[7] The Superior Court also observed that, "[w]hen reviewing an order granting suppression, [its] scope of review only includes 'the evidence of the defendant's witnesses and so much of the evidence for the prosecution as read in the context of the record as a whole remains uncontradicted.'" *Jackson*, 271 A.3d at 463 (quoting *Commonwealth v. Lindblom*, 854 A.2d 604, 606 (Pa. Super. 2004), *appeal denied*, 868 A.2d 1198 (Pa. 2005)). Further, (continued…)

As to its review of the investigative detention at issue, the Superior Court explained:

> In order to determine whether the police had a reasonable suspicion [when they executed a *Terry* stop], the totality of the circumstances—the whole picture—must be considered. Based upon that whole picture, the detaining officer[] must have a particularized and objective basis for suspecting the particular person stopped of criminal activity. [I]n determining whether the officer acted reasonably . . . due weight must be given, not to his inchoate and unparticularized suspicion or 'hunch,' but to the specific reasonable inferences which he is entitled to draw from the facts in light of his experience.

*Id*. (citations and some quotation marks omitted) (some alterations in original) (quoting *In re D.M.*, 781 A.2d at 1163; *United States v. Cortez*, 449 U.S. 411, 417-18 (1981); and *Terry*, 392 U.S. at 27).

Turning to the facts of this case, the Superior Court recounted that Officer Swinarski heard gunshots and drove his marked car toward the location from where he believed the gunshots emanated. Arriving near that area shortly thereafter, Officer Swinarski discovered Jackson running in Officer Swinarski's direction and away from the location of the gunshots. Jackson was the lone individual running on the street. Thus, the Superior Court explained that "[t]his piqued the officer's curiosity that . . . Jackson might have some tie to the gunshots." *Id*. The Superior Court noted that, exiting his cruiser, Officer Swinarski "followed up on his hunch by asking . . . Jackson 'what he was running from,'" which the Superior Court commended as "precisely the type of continued investigation that the Fourth Amendment demands police undertake *before* detaining someone." *Id*. (emphasis in original) (quoting N.T., 02/11/2021, at 17).

The Superior Court then referenced its decision of *Commonwealth v. Bryant*, 866 A.2d 1143 (Pa. Super.), *appeal denied*, 876 A.2d 392 (Pa. 2005), where it concluded

---

where police have "invaded the privacy of an individual without a warrant," the Superior Court noted that it must review whether the police possessed reasonable suspicion under a *de novo* standard. *Id.* (citing *Ornelas v. United States*, 517 U.S. 690 (1996)).

that an officer has reasonable suspicion to conduct an investigative detention where the "officer reasonably deduces that the individual is potentially 'a perpetrator, victim, or eyewitness of a possible shooting.'" *Jackson*, 271 A.3d at 464 (quoting *Bryant*, 866 A.2d at 1147). In *Bryant*, the Superior Court explained, an officer likewise did not personally observe a suspected, recent shooting, but the "totality of the circumstances (being in a high-crime area, the police officer hearing gunshots and seeing three men running from the area where [the officer] believed the gunshots originated) justified a *Terry* stop." *Id*.

Although Jackson attempted to distinguish *Bryant* on the grounds that the suppression court in the instant matter found that Jackson was *not* in a high-crime area and the defendant and his companions in *Bryant* were the only people fleeing on a crowded street, the Superior Court rejected Jackson's arguments. Specifically, the Superior Court emphasized that, prior to ordering Jackson to stop, Officer Swinarski inferred from the totality of the circumstances that Jackson "could be the victim, the witness, or possibly an offender at that time." *Id.* (quoting N.T., 02/11/2021, at 27). That "real-time assessment of a highly dangerous, rapidly developing situation," the Superior Court opined, "was well reasoned" and comported with *Bryant*. *Id*.

> The Superior Court further explained:
>
> Where an individual . . . admits to law enforcement that he is fleeing from gunshots and is the lone person *who may have more information or connection to the shooting*, this creates reasonable suspicion for the police to stop him and further investigate. In this instance, [Officer Swinarski's] inference that . . . Jackson was probably connected to the active-shooter event was quite reasonable, regardless of the neighborhood where these events unfolded. Thus, the Commonwealth's failure to establish the high-crime-area factor is irrelevant.

*Id*. at 464-65 (emphasis added). Accordingly, the Superior Court concluded that the suppression court erroneously held that Officer Swinarski initiated an unconstitutional *Terry* stop when he directed Jackson to stop running so that he could investigate the gunshots further. As a result, the Superior Court vacated the suppression court's order

and remanded for the suppression court to determine whether Officer Swinarski's actions following the lawful *Terry* stop were likewise constitutional.

## II. ISSUE

Jackson filed a petition seeking this Court's discretionary review, which we granted to consider the following issue, as stated by Jackson:

> Did the Superior Court err, and enter a ruling which conflicts with holdings of the Pennsylvania Supreme Court, the United States Supreme Court, and other panels of the Pennsylvania Superior Court when it held that the [suppression] court committed an error of law when it suppressed evidence recovered after a person was seized by police even though the officer did not suspect the individual stopped of criminal activity?

*Commonwealth v. Jackson*, 283 A.3d 175 (Pa. 2022) (*per curiam*) (alteration in original).

## III. ARGUMENTS

Jackson contends that the Superior Court erroneously vacated the suppression court's holding and issued an opinion that conflicts with the precedent of the United States Supreme Court, this Court, and other decisions of the Superior Court, when it held that Officer Swinarski had reasonable suspicion to detain Jackson. This is particularly so, Jackson insists, where the Superior Court recognized the correct standard for reasonable suspicion to conduct a *Terry* stop—*i.e.*, that "the detaining officers *must* have a particularized and objective basis *for suspecting the particular person stopped of criminal activity*"—but misapplied that standard and failed to acknowledge certain "dispositive" facts in this matter. (Jackson's Br. at 22, 31 (emphasis in original) (quoting *Jackson*, 271 A.3d at 464).) Jackson specifically faults the Superior Court for ignoring Officer Swinarski's admissions at the suppression hearing that Jackson's conduct was not unusual or suspicious, that Jackson engaged in absolutely normal behavior by running from gunshots, and that he did not suspect Jackson of being involved in criminal activity

in concluding that Officer Swinarski had a reasonable basis for suspecting Jackson of criminal activity.[8]

Jackson further emphasizes that the location was not a high-crime area and that he was not fleeing from police at the time of the stop; rather, he was a lone individual already running away from a dangerous situation and toward Officer Swinarski after hearing gunshots. Jackson adds that he even answered Officer Swinarski's question as he was running. Jackson also argues that the Superior Court's reliance on *Bryant* is erroneous insofar as the Superior Court misinterpreted that case to allow for the detention of an individual based on any lesser standard than that required under *Terry* and its progeny. Jackson further reiterates that *Bryant* is factually distinguishable from the instant matter and instead directs this Court's attention to *Commonwealth v. Rohrbach*, 267 A.3d 525 (Pa. Super. 2021), arguing that it compels the same outcome in this case.

In sum, Jackson insists that the Superior Court's decision in the instant case dispenses with the proper requirement for reasonable suspicion and conflicts with volumes of state and federal case law establishing that an officer must have a particularized and reasonable suspicion of criminal activity relative to a particular individual to conduct a *Terry* stop. According to Jackson, "condoning officers to order people who are not suspected of criminal activity to stop as they flee from danger is dangerous, counter-productive[,] and unconstitutional." (Jackson's Br. at 40.) For those reasons, Jackson urges this Court to reverse the decision of the Superior Court.

---

[8] Jackson points out that the Commonwealth has the burden at a suppression hearing of proving, by a preponderance of the evidence, that the challenged evidence was not obtained in violation of a defendant's rights. (Jackson's Br. at 30 (citing *In re L.J.*, 79 A.3d 1073, 1086 (Pa. 2013)).) He also notes that it is well-settled in Pennsylvania that "contraband discarded during an unlawful pursuit must be suppressed." (*Id.* (quoting *Commonwealth v. Taggart*, 997 A.2d 1189, 1196 (Pa. Super. 2010), *appeal denied*, 17 A.3d 1254 (Pa. 2011)).)

The Commonwealth responds first by recognizing that an investigatory stop is lawful "where the police officer reasonably suspects that the person apprehended is committing or has committed a criminal offense." (Commonwealth's Br. at 9-10 (quoting *Interest of T.W.*, 261 A.3d 409, 417 (Pa. 2021)).) Contrary to Jackson's assertions, the Commonwealth contends that the Superior Court correctly held, pursuant to the foregoing standard, that Officer Swinarski possessed the requisite reasonable suspicion to detain Jackson. The Commonwealth points to the following specific facts:

> Officer Swinarski was on patrol in an area of Philadelphia that had seen a large increase in gun violence. The officer heard multiple gunshots and drove in the direction of the gunfire. As he did so, he saw [Jackson] running down the street coming from the direction of the [gun]shots. [Jackson] was the only pedestrian in the area. As [Officer Swinarski] explained, no other people were "out" at the time.[9] Officer Swinarski stopped his car, got out, and asked [Jackson] why he was running. [Jackson] told the officer he was running from the gunshots.

(*Id*. at 10 (citation and footnotes omitted).) Adding that the incident occurred after dark, the Commonwealth insists that these circumstances provided a sufficient basis for Officer Swinarski to stop Jackson for a brief investigation in relation to the apparent shooting that had just occurred. The Commonwealth references *Bryant* and several other cases from various jurisdictions in support of its argument, relying particularly upon the Supreme Court of Ohio's decision in *State v. Hairston*, 126 N.E.3d 1132 (Ohio), *cert. denied*, 140 S.Ct. 390 (2019). The Commonwealth also asserts that Jackson's reliance on *Rohrbach* is misplaced because that case is factually distinguishable.

Additionally, the Commonwealth attacks any reliance on the suppression court's conclusion that the area was not a "high-crime area" as "pure semantics."

---

[9] The Commonwealth emphasizes that, although it may be normal behavior for people to run from gunshots, this is not a situation where Officer Swinarski saw a large group of people running from gunshots and randomly selected one person from that group to detain. Instead, Jackson was the only person running on the street. (Commonwealth's Br. at 20.)

(Commonwealth's Br. at 16.) While conceding that Officer Swinarski "did not intone the magic words 'high-crime area,'" the Commonwealth emphasizes that he explained that the locality had seen "a large increase in gun violence," which is a more detailed and useful description particularly given that Officer Swinarski stopped Jackson based upon his potential involvement in a shooting. (*Id.* (quoting N.T., 02/11/2021, at 20).) Thus, the Commonwealth urges that Officer Swinarski's more detailed description should not undermine the conclusion that Officer Swinarski had reasonable suspicion to detain Jackson. Noting that the existence of a "high-crime area" is not necessary to establish reasonable suspicion, but is sometimes relevant for purposes of analyzing the probability of whether a person's conduct is linked to criminal activity, the Commonwealth explains that Jackson's conduct of running down the street was clearly related to criminal activity here because, *inter alia*, his own words established that he was running from the gunshots and not for some other non-criminal reason. The Commonwealth submits that "the fact that [Jackson] was running as a direct result of a crime that had just occurred provided a more compelling reason to suspect him of criminal conduct than if he had simply been running in a location that had a reputation for being a 'high-crime area,' but where the police had no knowledge of any actual crime having recently been committed." (*Id.* at 19.)

The Commonwealth also contests Jackson's claim that Officer Swinarski expressly conceded in his testimony that he did not suspect Jackson of being involved in criminal activity and submits that, in any event, "such a concession would be irrelevant because the question of whether an officer had reasonable suspicion to stop someone 'is an objective one.'"[10] (*Id.* at 22 (quoting *Commonwealth v. Holmes*, 14 A.3d 89, 96

---

[10] In disputing whether Officer Swinarski actually conceded that Jackson was not suspected of criminal activity in his testimony, the Commonwealth notes that the exchange between Jackson's counsel and Officer Swinarski went as follows:

(continued…)

(Pa. 2011)).) Thus, viewing the facts of this case *objectively*, the Commonwealth insists that an officer in Officer Swinarski's position could reasonably suspect Jackson of involvement in criminal activity, regardless of Officer Swinarski's subjective beliefs. (*Id*. at 23 (quoting *Brigham City, Utah v. Stuart*, 547 U.S. 398, 404 (2006) ("An action is 'reasonable' under the Fourth Amendment, regardless of the individual officer's state of mind, as long as the circumstances, viewed *objectively*, justify [the] action." (some internal quotation marks omitted) (emphasis and alteration in original))).)[11]

---

[Jackson's counsel:] When that gentleman—when this citizen was running down the street, he was not under police investigation for any criminal activity, was he?

[Officer Swinarski:] For no—for criminal activity, no.

(Commonwealth's Br. at 22 n.9 (quoting N.T., 02/11/2021, at 31).) "Given the awkward wording of the question," the Commonwealth submits that Officer Swinarski may not have understood what Jackson's counsel meant by "under police investigation." (*Id*.) In any event, the Commonwealth notes that Officer Swinarski testified twice that Jackson was "possibly an offender," thereby dispelling any doubt as to whether Officer Swinarski suspected Jackson of being involved in criminal activity. (*Id*. (quoting N.T., 02/11/2021, at 17, 27).)

[11] Alternatively, the Commonwealth argues that Officer Swinarksi's investigative detention of Jackson would be constitutional under the law applicable in other contexts, such as those involving the detention of witnesses or victims of criminal activity or DUI checkpoints. *See, e.g.*, *Commonwealth v. Beaman*, 880 A.2d 578 (Pa. 2005) (applying three-prong balancing test to determine whether sobriety checkpoint was unconstitutional seizure in violation of Fourth Amendment to United States Constitution and Article I, Section 8 of Pennsylvania Constitution); *Illinois v. Lidster*, 540 U.S. 419 (2004) (applying same balancing test to suspicionless driving checkpoint set up in search for suspect in fatal hit-and-run incident); *State v. Fair*, 302 P.3d 417, 431 (Or. 2013) ("[I]t is permissible under [Article I, Section 9 of the Oregon Constitution] for officers to stop and detain someone for on-the-scene questioning whom they reasonably suspect can provide material information about a crime's commission.").

# IV. DISCUSSION[12]

## A. Reasonable Suspicion

Given the nature of the parties' constitutional arguments as well as the Superior Court's decision, we first consider *Terry* stops generally and the reasonable suspicion standard necessary for a police officer to conduct an investigative detention. The Fourth Amendment to the United States Constitution and Article I, Section 8 of the Pennsylvania Constitution contain similar text, both mandating that the people be free from "unreasonable searches and seizures" and that any intrusion by the government, whether federal or state, upon persons, houses, papers, and effects or possessions, be supported by "probable cause." U.S. Const., amend. IV; Pa. Const. art I, § 8. By necessity, *Terry*—which "involved a brief, on-the-spot stop on the street and a frisk for weapons"—represents an exception to the probable cause requirement:

> *Terry* for the first time recognized an exception to the requirement that Fourth Amendment seizures of persons must be based on probable cause. . . . [S]ince the intrusion involved in a "stop and frisk" was so much less severe than that involved in traditional "arrests," the Court declined to stretch the concept of "arrest"—and the general rule requiring probable

---

[12] As noted by the Superior Court, we review determinations of reasonable suspicion *de novo* on appeal. *Ornelas*, 517 U.S. at 699 ("We therefore hold that as a general matter determinations of reasonable suspicion and probable cause should be reviewed *de novo* on appeal. Having said this, we hasten to point out that a reviewing court should take care both to review findings of historical fact only for clear error and to give due weight to inferences drawn from those facts by resident judges and local law enforcement officers."). Jackson is likewise correct that the Commonwealth bears the burden at a suppression hearing of proving "by a preponderance of the evidence that the challenged evidence is admissible." *Commonwealth v. DeWitt*, 608 A.2d 1030, 1031 (Pa. 1992); Pa.R.Crim.P. 581(H). Moreover,

> [w]hen reviewing rulings of a suppression court, we must consider only the evidence of the prosecution and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. Where the record supports the findings of the suppression court, we are bound by those facts and may reverse only if the legal conclusions drawn therefrom are in error.

*Commonwealth v. E.M.*, 735 A.2d 654, 657 (Pa. 1999) (citation omitted).

cause to make arrests "reasonable" under the Fourth Amendment—to cover such intrusions. Instead, the Court treated the stop-and-frisk intrusion as a *sui generis* "rubric of police conduct[.]"

*Dunaway v. New York*, 442 U.S. 200, 208-09 (1979) (citation omitted). As the United States Supreme Court has explained,

> a "stop and frisk" [i]s constitutionally permissible if two conditions are met. First, the investigatory stop must be lawful. That requirement is met in an on-the-street encounter, *Terry* determined, when the police officer reasonably suspects that the person apprehended is committing or has committed a criminal offense. Second, to proceed from a stop to a frisk, the police officer must reasonably suspect that the person stopped is armed and dangerous.

*Arizona v. Johnson*, 555 U.S. 323, 326-27 (2009).

As indicated above, this case concerns only the investigatory stop, not a frisk. In this regard, *Terry* permitted such an intrusion under circumstances "where a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that *criminal activity may be afoot*." *Terry*, 392 U.S. at 30 (emphasis added). In *Cortez*, although recognizing that reasonable suspicion is an "elusive concept," the United States Supreme Court emphasized that "[a]n investigatory stop must be justified by some objective manifestation that the person stopped is, or is about to be, engaged in criminal activity." *Cortez*, 449 U.S. at 417 (citing, *inter alia*, *Brown v. Texas*, 443 U.S. 47, 51 (1979) ("[T]he Fourth Amendment requires that a seizure must be based on specific, objective facts indicating that society's legitimate interests require the seizure of the particular individual, or that the seizure must be carried out pursuant to a plan embodying explicit, neutral limitations on the conduct of individual officers.")); *see also United States v. Goodrich*, 450 F.3d 552, 560 (3d Cir. 2006) (recognizing that "an officer cannot conduct a *Terry* stop simply because criminal activity is afoot" and that, "[i]nstead, the officer must have a particularized and objective basis for believing that *the particular person* is suspected of criminal activity" (emphasis in original) (quoting *United States v. Brown*, 159 F.3d 147, 149 (3d Cir. 1998), *cert. denied*, 525 U.S. 1184 (1999))). The *Cortez*

decision further advised that "the detaining officers must have a particularized and objective basis for suspecting the particular person stopped of criminal activity" based on "the whole picture." *Cortez*, 449 U.S. at 417-18. The United States Supreme Court continued:

> The idea that an assessment of the whole picture must yield a particularized suspicion contains two elements, each of which must be present before a stop is permissible. First, the assessment must be based upon all the circumstances. The analysis proceeds with various objective observations, information from police reports, if such are available, and consideration of the modes or patterns of operation of certain kinds of lawbreakers. From these data, a trained officer draws inferences and makes deductions—inferences and deductions that might well elude an untrained person.
>
> The process does not deal with hard certainties, but with probabilities. Long before the law of probabilities was articulated as such, practical people formulated certain common sense conclusions about human behavior; jurors as factfinders are permitted to do the same—and so are law enforcement officers. Finally, the evidence thus collected must be seen and weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement.
>
> The second element contained in the idea that an assessment of the whole picture must yield a particularized suspicion is the concept that the process just described must raise a suspicion that the particular individual being stopped is engaged in wrongdoing. Chief Justice Warren, speaking for the Court in *Terry*[,] said that, "[t]his demand for specificity in the information upon which police action is predicated is the central teaching of this Court's Fourth Amendment jurisprudence."

*Id.* at 418 (emphasis omitted) (quoting *Terry*, 392 U.S. at 21 n.18).

With respect to the nature of the inquiry being an objective one considering the totality of the circumstances, the United States Supreme Court in *Terry* explained:

> [I]n justifying the particular intrusion the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion. The scheme of the Fourth Amendment becomes meaningful only when it is assured that at some point the conduct of those charged with enforcing the laws can be subjected to the more detached, neutral scrutiny of a judge who must evaluate the reasonableness of a particular search or seizure in light of the

particular circumstances. And in making that assessment it is imperative that the facts be judged against an objective standard: would the facts available to the officer at the moment of the seizure or the search 'warrant a man of reasonable caution in the belief' that the action taken was appropriate?

*Terry*, 392 U.S. at 21-22 (footnotes omitted). Indeed, more generally, the United States Supreme Court has observed that "reasonableness"—the "touchstone of the Fourth Amendment"—is "predominantly an objective inquiry." *Ohio v. Robinette*, 519 U.S. 33, 39 (1996) (quoting *Florida v. Jimeno*, 500 U.S. 248, 250 (1991)); *Ashcroft v. al-Kidd*, 563 U.S. 731, 736 (2011) (quoting *Indianapolis v. Edmond*, 531 U.S. 32, 47 (2000)).

We ask whether "the circumstances, viewed objectively, justify [the challenged] action." *Scott v. United States*, 436 U.S. 128, 138 . . . (1978). If so, that action was reasonable "*whatever* the subjective intent" motivating the relevant officials. *Whren v. United States*, 517 U.S. 806, 814 . . . (1996). This approach recognizes that the Fourth Amendment regulates conduct rather than thoughts, *Bond v. United States*, 529 U.S. 334, 338[] n.2 . . . (2000); and it promotes evenhanded, uniform enforcement of the law, *Devenpeck v. Alford*, 543 U.S. 146, [153-54] . . . (2004).

*Ashcroft*, 563 U.S. at 736 (emphasis and one alteration in original). With little exception, the United States Supreme Court has made clear that, if an intrusion is objectively reasonable, the subjective beliefs or motives of an officer are of no import to the analysis.[13] *See, e.g., Scott*, 436 U.S. at 138 ("We have . . . held that the fact that the officer does not have the state of mind which is hypothecated by the reasons which provide the legal justification for the officer's action does not invalidate the action taken as long as the circumstances, viewed objectively, justify that action."); *Whren*, 517 U.S. at 813 (recognizing that United States Supreme Court has been "unwilling to entertain Fourth Amendment challenges based on the actual motivations of individual officers" and

---

[13] Such exceptions include "special-needs and administrative-search cases." *Ashcroft*, 563 U.S. at 736. Additionally, "programmatic purposes may be relevant to the validity of Fourth Amendment intrusions undertaken pursuant to a general scheme without individualized suspicion," such as "suspicionless vehicle checkpoints set up for the purpose of detecting illegal narcotics." *Id.* at 737-38 (emphasis omitted) (quoting *Edmond*, 531 U.S. at 45-46).

that "[s]ubjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis"); *Bond*, 529 U.S. at 338 n.2 ("The parties properly agree that the subjective intent of the law enforcement officer is irrelevant in determining whether that officer's actions violate the Fourth Amendment."); *Illinois v. Rodriguez*, 497 U.S. 177, 183-86 (1990) (holding that officer's mistake of fact does not invalidate warrantless entry of home under Fourth Amendment so long as mistake is reasonable); *Heien v. North Carolina*, 574 U.S. 54, 60-61, 66 (2014) (holding that reasonable suspicion can rest on "mistaken understanding of the scope of a legal prohibition" if mistake of law—just as mistake of fact—is "*objectively* reasonable" and that Court "do[es] not examine the subjective understanding of the particular officer involved" (emphasis in original)); *Brigham*, 547 U.S. at 404-05 (observing that "officer's subjective motivation is irrelevant" to Fourth Amendment reasonableness analysis and, thus, concluding it did not matter whether officers' warrantless entry into home was made "to arrest respondents and gather evidence against them or to assist the injured and prevent further violence"); *United States v. Knights*, 534 U.S. 112, 121-22 (2001) (holding that warrantless search of probationer's apartment that was supported by reasonable suspicion and authorized by probation condition comported with Fourth Amendment and explaining that, "[b]ecause [the Court's] holding rests on ordinary Fourth Amendment analysis that considers all the circumstances of a search, there is no basis for examining official purpose" of search).

Moreover, it is axiomatic that reasonable suspicion requires more than "a mere 'hunch'" but "considerably less than proof of wrongdoing by a preponderance of the evidence, and obviously less than is necessary for probable cause." *Navarette v. California*, 572 U.S. 393, 397 (2014) (some internal quotation marks omitted) (quoting *Terry*, 392 U.S. at 27; *United States v. Sokolow*, 490 U.S. 1, 7 (1989)); *see also United States v. Arvizu*, 534 U.S. 266, 274 (2002) ("Although an officer's reliance on a mere

[]'hunch'[] is insufficient to justify a stop, the likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard." (internal citations omitted)). Rather,

> [t]he Fourth Amendment does not require a policeman who lacks the precise level of information necessary for probable cause to arrest to simply shrug his shoulders and allow a crime to occur or a criminal to escape. On the contrary, *[T]erry* recognizes that it may be the essence of good police work to adopt an intermediate response. A brief stop of a suspicious individual, in order to determine his identity or to maintain the status quo momentarily while obtaining more information, may be most reasonable in light of the facts known to the officer at the time.

*Adams v. Williams*, 407 U.S. 143, 145-46 (1972) (citation omitted). In this regard, the United States Supreme Court also has "consistently recognized that reasonable suspicion 'need not rule out the possibility of innocent conduct.'" *Navarette*, 572 U.S. at 403 (quoting *Arvizu*, 534 U.S. at 277). *Terry* involved "ambiguous" conduct that "was by itself lawful" and "susceptible of an innocent explanation" but "also suggested that the individuals were" about to engage in criminal activity. *Illinois v. Wardlow*, 528 U.S. 119, 125 (2000). In allowing brief detentions "to resolve the ambiguity[,] . . . *Terry* accepts the risk that officers may stop innocent people." *Id.* at 125-26 (citation omitted); *see also Gomez v. United States*, 597 A.2d 884, 890 (D.C. 1991) ("[S]uspicious conduct by its very nature is ambiguous, and the principal function of the investigative stop is to quickly resolve that ambiguity" (quoting *State v. Anderson*, 454 N.W.2d 763, 766 (Wis. 1990))). Moreover, "officers, like jurors, may rely on probabilities in the reasonable suspicion context." *Kansas v. Glover*, 140 S.Ct. 1183, 1190 (2020).

Turning to our own precedent, as the Superior Court acknowledged, this Court follows *Terry* and its progeny in assessing the constitutionality of investigative detentions. *See In re D.M.*, 781 A.2d at 1163 ("Pennsylvania courts have consistently followed *Terry* in stop and frisk cases, including those in which the appellants allege protections pursuant

to Article 1, Section 8 of the Pennsylvania Constitution.").[14] In accord with that precedent, this Court has repeatedly observed that the analysis is based on an objective view of the totality of the circumstances. *See, e.g.*, *Holmes*, 14 A.3d at 96 ("The determination of whether an officer had reasonable suspicion that criminality was afoot so as to justify an investigatory detention is an objective one, which must be considered in light of the totality of the circumstances."); *Commonwealth v. Chase*, 960 A.2d 108, 120 (Pa. 2008) ("Reasonable suspicion sufficient to stop a motorist must be viewed from the standpoint of an objectively reasonable police officer."); *Commonwealth v. Rogers*, 849 A.2d 1185, 1189 (Pa. 2004) ("In order to determine whether the police officer had reasonable suspicion, the totality of the circumstances must be considered."); *Commonwealth v. Zhahir*, 751 A.2d 1153, 1156-57 (Pa. 2000) (explaining that "[t]he fundamental inquiry [relative to reasonable suspicion] is an objective one" that "requires an evaluation of the totality of the circumstances, with a lesser showing needed to demonstrate reasonable suspicion in terms of both quantity or content and reliability" (citations omitted)).

In this vein, our Court has similarly recognized that the subjective motives or beliefs of an officer do not factor into the "reasonableness" of a detention that is objectively based on reasonable suspicion. *See Chase*, 960 A.2d at 120 (citing *Whren* and observing that, "if police can articulate a reasonable suspicion of a Vehicle Code violation, a constitutional inquiry into the officer's motive for stopping the vehicle is unnecessary" and further explaining that "even stops based on factual mistakes generally are constitutional if the mistake is objectively reasonable"). We have likewise emphasized the significance of the requirement that reasonable suspicion be particularized to the individual to be detained. *See Commonwealth v. Hicks*, 208 A.3d 916, 938 (Pa.) ("The individualized nature of the

---

[14] It is worth noting that Jackson does not argue that the Pennsylvania Constitution affords him greater protection than the United States Constitution under the circumstances presented.

justification for a seizure is central to the *Terry* doctrine, inherent in the requirement that an investigative detention must be premised upon specific and articulable facts particular to the detained individual."), *cert. denied*, 140 S.Ct. 645 (2019); *In re D.M.*, 781 A.2d at 1163 ("Based upon that whole picture the detaining officers must have a particularized and objective basis for suspecting the particular person stopped of criminal activity." (quoting *Cortez*, 449 U.S. at 417-18)). Further, we have opined that "reasonable suspicion does not require that the activity in question must be unquestionably criminal before an officer may investigate further." *Rogers*, 849 A.2d at 1190.

Based on the foregoing, we take this opportunity to reiterate that, in determining whether an officer has reasonable suspicion to conduct an investigative detention, we examine the totality of the circumstances at issue to discern whether there were particularized and objective grounds upon which to suspect that the individual detained was, or was about to be, engaged in criminal activity. But we emphasize that reasonable suspicion is not an exact science that requires *absolute certainty* that an individual was or was about to be involved in criminal activity, as that would undermine *Terry*'s purpose as an *investigative* tool that requires an even lesser showing than probable cause. For that reason, we allow officers to rely on probabilities and their experience to make split-second decisions to investigate and prevent crime and to promote their own safety— so long as their suspicion of criminal activity is articulable, objectively reasonable, and particularized to the individual to be detained based on the circumstances as a whole. Furthermore, if reasonable suspicion supports the investigative detention based on an objective view of the totality of the circumstances, we do not inquire into the subjective views of an officer in conducting an investigative detention. With that made clear, we proceed to consider the investigative detention at issue in this case.

**B. Officer Swinarski's Investigative Detention of Jackson**

As previously described, Officer Swinarski heard gunshots while he was on routine patrol and began to travel toward the direction from which he believed they emanated. Shortly thereafter, Officer Swinarski encountered a *single individual*—Jackson—running from what he believed to be the source of the gunshots. Officer Swinarski then asked Jackson what he was doing, at which point Jackson responded that he was "running from the gunshots," thereby connecting himself to the criminal activity at issue.[15] Notably, Jackson continued on his way after responding to Officer Swinarski and gave no indication that he sought Officer Swinarski's protection or aid during the interaction leading up to the stop. Based on these facts and the rational inferences gleaned therefrom, we would conclude that Officer Swinarski had a particular and objective basis for suspecting that Jackson may have just committed a criminal offense, thereby justifying a seizure of Jackson for purposes of conducting an investigatory detention under *Terry* and its progeny.

In reaching our conclusion, we find this case to be more akin to *Hairston* and *Bryant* than *Rohrbach*. In *Hairston*, two police officers were responding to an unrelated call one evening when they heard gunshots nearby and traveled to where they believed the gunshots originated. *Hairston*, 126 N.E.3d at 1134-35. That location was an area

---

[15] While gunshots may not in every circumstance indicate criminal activity, it would be unreasonable for a police officer in Officer Swinarski's position not to suspect that the sound of gunshots in an area where the possession and discharge of firearms are regulated strongly suggests that a crime—and a potentially serious crime—likely occurred or was occurring and to proceed to investigate. *See*, *e.g.*, Sections 6106(a)(1) and 6108 of the Crimes Code; Phila. Code § 10-810(1) (prohibiting discharge of firearms recklessly and without reasonable cause); Phila. Code § 10-814(2) (prohibiting, *inter alia*, acquisition or transfer of any firearm in Philadelphia without license); and Phila. Code § 10-818(2) (providing that, generally, "[n]o person shall carry a firearm upon the public streets or upon any public property at any time" without license). Indeed, the parties do not dispute that the sound of gunshots in this matter was indicative of criminal activity as opposed to some other non-criminal event.

outside of an elementary school where drug activity and other crimes were known to take place at night. *Id*. at 1135. Roughly 30 to 60 seconds after hearing the gunshots, the officers observed the defendant, who was the only person in the area, walking across a street and talking on a cellphone. *Id.* The officers detained the defendant and discovered a firearm on his person. *Id.* The Supreme Court of Ohio concluded that the "cumulative facts" demonstrated that the officers possessed reasonable suspicion to detain the defendant given that the officers "personally heard the sound of [close-by] gunshots" and did not rely on secondhand information or radio dispatch; one officer "knew from personal experience that crime often occurred at night in the area where" the investigative detention occurred; the investigative detention occurred at night; and, "most important[ly,] . . . the stop occurred very close in time to the gunshots and [the defendant] was the only person in the area from which the shots emanated." *Id*. at 1136. Notably, the Ohio Supreme Court faulted the lower court for reaching the opposite conclusion by "focusing on individual factors in isolation rather than on the totality of the circumstances." *Id.* at 1137. The Ohio Supreme Court emphasized that, while the court below "may have been correct in concluding that none of the individual factors that the state relied on was sufficient in itself to create a reasonable suspicion," the facts when taken together and viewed "through the eyes of a reasonable police officer" did create the requisite reasonable suspicion to stop the defendant "to see if he was the source of or had information about the gunshots." *Id*.

Similarly, in *Bryant*, two police officers were on routine patrol in a vehicle around 8 p.m. "when they heard six 'popping' sounds" that the officers believed were gunshots. *Bryant*, 866 A.2d at 1144. Moments later, the officers observed the defendant and two other males running from the general vicinity of where the possible gunshots originated, which the officers knew to be a high-crime area. *Id.* at 1144-47. The individuals had

turned a corner onto a crowded street where no one else was running. *Id.* at 1144-45. One of the officers detained the individuals and, while conducting a subsequent pat-down of the defendant, discovered narcotics. *Id.* at 1145. The Superior Court concluded that the objective facts before the officer at the time he conducted the investigative detention— *i.e.*, the defendant running from the location of gunshots heard by the officer in the evening in a high-crime area and on a street where no one else was running—were sufficient to establish reasonable suspicion. *Id.* at 1146-47. Specifically, the Superior Court opined that a reasonable officer in that position could have concluded that the defendant was "a perpetrator, victim, or eyewitness of a possible shooting," thereby justifying a *Terry* stop "for the purpose of determining [the defendant's] identity and maintaining the *status quo* while obtaining more information." *Id.* at 1147.

In *Rohrbach*, the defendant parked his vehicle in a gym parking lot that was known for "high-drug activity." *Rohrbach*, 267 A.3d at 527. Although the owner of the lot had made reports to police about suspicious vehicles/activity in the lot before and the police regularly patrolled the lot, the owner did not make a report on the date in question, nor had he described the defendant's vehicle to police in the past. *Id.* Two state troopers entered the lot in their marked vehicle where they discovered the defendant parked in a "not well-lit area," so the troopers drove toward the passenger side of the defendant's vehicle to investigate for a possible overdose or someone needing assistance. *Id.* Upon noticing the troopers, the defendant began backing out of the parking spot. *Id.* The troopers then honked their car horn, which all parties to the case agreed constituted a seizure for an investigative detention. *Id.* at 527, 528 n.2. After the defendant stopped his vehicle, the troopers approached on foot and discovered the smell of marijuana emanating from the vehicle. *Id.* at 527. The officers ultimately searched the vehicle and discovered a cannabis cigarette. *Id.*

On appeal, the Superior Court concluded that the troopers lacked reasonable suspicion to detain the defendant because the troopers did not have a particularized basis for suspecting the defendant of criminal activity. Rather, because the troopers relied on vague reports of random criminal conduct police had received in the past and not any specific report about the defendant's vehicle, the Superior Court opined that there was "as much likelihood that [the troopers'] car (or anyone else's) fit the owner's reports. On these facts, no one had reasonable grounds to stop the troopers' cruiser for an investigative detention, any more than the troopers had reasonable grounds to stop [the defendant's] for one." *Id.* at 529. Thus, as the Superior Court emphasized, there was no particularized connection between the alleged criminal activity that occurred in the parking lot and the defendant. Rather, the troopers had only observed the defendant's "car pull away from them in a high-crime area," which was insufficient to support reasonable suspicion to detain the defendant. *Id.* at 529-30.

The particularized nature of the reasonable suspicion standard is evident in *Hairston* and *Bryant*. The officers in *Hairston* witnessed the defendant, the lone individual in the area, walking away from the location of gunshots less than a minute after the gunshots were personally heard by the officers. Likewise, the officers in *Bryant* viewed the defendant and two individuals running from the location of gunshots onto a crowded street where no one else was running moments after the officers heard the gunshots. In this case, Officer Swinarski witnessed Jackson running from the location of gunshots shortly after he heard them, Jackson was the lone individual running on the street, and Jackson explained that he was running from the gunshots. Thus, this is not a case like

*Rohrbach* where the criminal activity in question lacked a sufficient connection to the defendant.[16]

In support of his argument that Officer Swinarski lacked reasonable suspicion to detain him, Jackson relies heavily on Officer Swinarski's testimony at the suppression hearing, wherein, Jackson contends, Officer Swinarski conceded that Jackson engaged in "normal" conduct and that he did not suspect Jackson of criminal activity at the time of their encounter. (*See* N.T., 02/11/2021, at 26, 30-31.) In other words, Jackson asks this Court to assess the constitutionality of the investigative detention here based on Officer Swinarski's subjective beliefs or motives in the heat of the moment. Jackson's request, however, is not in accord with the precedent outlined above, which teaches that the constitutionality of the detention here must be judged through an objective lens. Having concluded that reasonable suspicion supported Officer Swinarski's command to Jackson to stop under an objective view of the facts as a whole, Officer Swinarski's subjective beliefs or intentions do not factor into our reasonable suspicion analysis. *See Brigham*,

---

[16] Insofar as *Hairston*, *Bryant*, and *Rohrbach* considered the level of crime in the area at issue in the reasonable suspicion analysis, we reiterate that the suppression court found that the area where Officer Swinarski encountered Jackson was not a high-crime area and that the Superior Court found the high-crime-area factor to be irrelevant to its analysis. Notably, in so doing, the Superior Court observed that the use of this factor has garnered criticism. *See Jackson*, 271 A.3d at 465 n.4 (citing cases for, *inter alia*, "criticism that the high-crime-area factor is an illogical restriction on the powers of police in low[-]crime areas" and "depriv[es] citizens of equal protections of the constitution"). On this point, the Pennsylvania District Attorneys Association (Association) has filed an *amicus curiae* brief in support of the Commonwealth, wherein it insists that "[c]ourts can consider whether a stop occurs in a 'high[-]crime area[]' when determining whether an officer possessed reasonable suspicion to initiate a stop" pursuant to applicable precedent and that this Court should reject any suggestion that the high-crime-area factor is no longer viable. (*See* Association's Br. at 5.) For their part, the parties do not contest the validity of the high-crime-area factor generally but, instead, dispute whether that factor is present or otherwise required to be present in this case for purposes of establishing reasonable suspicion. Like the Superior Court, we do not find that the high-crime-area factor is determinative of the reasonable suspicion analysis in this case, and, therefore, we will not address it further in this Opinion.

547 U.S. at 404 ("An action is 'reasonable' under the Fourth Amendment, regardless of the individual officer's state of mind, 'as long as the circumstances, viewed *objectively*, justify [the] action." (emphasis and alteration in original) (quoting *Scott*, 436 U.S. at 138)); *see also Whren*, *Bond*, *Heien,* and *Rodriguez*. Thus, even accepting that Officer Swinarski conceded that he did not subjectively believe Jackson was engaged in criminal activity leading up to the stop—which is not at all clear when viewing his testimony as a whole, *see supra* at pages 4-5—that concession does not invalidate the stop.

Furthermore, we agree with the Superior Court that Officer Swinarski was evaluating in real time a potentially "highly dangerous, rapidly developing situation." *Jackson*, 271 A.3d at 464. In concluding that Officer Swinarski had the requisite reasonable suspicion to conduct an investigative detention of Jackson, we observe that Officer Swinarski was not required to rule out the possibility that Jackson was engaging in innocent conduct—as a mere witness or victim of criminal activity or otherwise—prior to the stop. Nonetheless, we are quick to underscore that, as this case falls under the *Terry* paradigm, it "does not implicate a scenario involving 'special needs, beyond the normal need for law enforcement[]' [or other situation] such as would dispense with the requirement of individualized suspicion." *Hicks*, 208 A.3d at 937 (quoting *Edmond*, 531 U.S. at 37). The United States Supreme Court has never sanctioned the investigative detention of a witness or a victim under *Terry*. *Cf. Terry*, 392 U.S. at 34 (White, J., concurring) ("There is nothing in the Constitution which prevents a policeman from addressing questions to anyone on the streets. Absent special circumstances, the person approached may not be detained or frisked but may refuse to cooperate and go on his way."); *Wardlow*, 528 U.S. at 125 ("[W]hen an officer, without reasonable suspicion or probable cause, approaches an individual, the individual has a right to ignore the police and go about his business."). Thus, while *Terry* does not require an officer to rule out the

possibility that the individual is a mere witness to or victim of criminal activity prior to detaining the individual for purposes of an investigative detention, and a lawful investigative detention may ultimately bear out those facts, it is not enough for the circumstances to establish a reasonable suspicion that the individual is only a witness or victim. It is axiomatic that an investigative detention under *Terry* requires individualized suspicion that the person detained is engaged in criminal activity. As such, we disapprove of the Superior Court's decision to the extent that it suggests that *Terry* permits a police officer to detain an individual that merely has "more information" about or a "connection to" a criminal event, *Jackson*, 271 A.3d at 464-65, absent an objective basis for suspecting that the particular individual is or is about to be involved or engaged in criminal activity.[17]

Relatedly, we acknowledge that some facts presented in this case—such as running from gunshots—may be viewed as innocent in and of themselves. In this vein, our decision should not be interpreted as holding that a police officer will have reasonable suspicion to conduct an investigative detention in every circumstance where the officer encounters an individual or individuals running from the sound or location of gunshots. As we recognized in *Hicks*, *per se* rules necessarily detract from the evaluation of the totality of the circumstances and the particularized focus on the individual that are necessary for an investigative detention under *Terry* and *Cortez*. *See Hicks*, 208 A.3d at 939 ("Such is a danger of *per se* rules, pursuant to which the totality of the circumstances inquiry—the whole picture—is subordinated to the identification of one, single fact."). But where certain facts will not establish reasonable suspicion when taken

---

[17] Additionally, because we conclude that reasonable suspicion existed to support Officer Swinarski's investigative detention of Jackson under *Terry*, we need not address the Commonwealth's alternative argument that the detention was proper under the law applicable to other contexts as referenced *supra* note 11.

alone, those same facts may establish reasonable suspicion in the aggregate. *See Commonwealth v. Cook*, 735 A.2d 673, 677 (Pa. 1999); *Terry*, 392 U.S. at 22 (explaining that officer discharged "legitimate investigative function" when approaching individuals, noting that officer observed individuals engage in "a series of acts, each of them perhaps innocent in itself, but which taken together warranted further investigation"); *Arvizu*, 534 U.S. at 277-78 ("Undoubtedly, each of these factors alone is susceptible of innocent explanation . . . . Taken together, we believe they sufficed to form a particularized and objective basis for . . . stopping the vehicle, making the stop reasonable within the meaning of the Fourth Amendment."). As such, while the individual facts of this case may not have supported a finding of reasonable suspicion standing alone, we conclude that, based on the *totality* of the circumstances of this case viewed under an objective lens, Officer Swinarski possessed the reasonable suspicion necessary to detain Jackson.

At the outset of his Opinion in Support of Reversal, Justice Wecht pens a story to set the stage for his ensuing legal analysis. OISR at 1-2. In his story, Justice Wecht evaluates the reasonableness of a *Terry* stop from the perspective of "you," the reader, who recently concluded a meal with friends and a bottle (or two, or three) of Cabernet Sauvignon. Toward the end of the evening, as the reader exits the establishment, gunfire erupts, prompting the reader to flee the area. The reader's entirely understandable effort to run away from the gunshots, however, is briefly interrupted by a police officer who is not running away from the gunshots, but toward them at risk to his/her personal safety. For Justice Wecht, the reader would clearly find this stop unreasonable and, thus, unconstitutional. *See id.* at 2-3. Stated otherwise, the responding officer's effort to detain briefly the reader to assess the situation violated the reader's constitutional right to be free from an unreasonable seizure. After all, the reader was not involved in the gunshots directly and was engaging in perfectly innocent and understandable conduct. The law,

however, does not evaluate the reasonableness of a temporary detention from the perspective of an innocent person. In Justice Wecht's tale, the responding police officer did not know "you," the reader, were an innocent bystander, let alone a wine enthusiast. It is axiomatic that entirely innocent people may be caught up in a *Terry* stop. The police officer also did not know whether the reader was fleeing the gunshots for safety or fleeing them to avoid apprehension by law enforcement. The law does not require a police officer to resolve this question before making a *Terry* stop. The question, for Fourth Amendment purposes, is not whether the innocent person reasonably fleeing gunshots would feel inconvenienced, burdened, or violated. The question, instead, is whether, from the perspective of the police officer, there was reasonable suspicion to believe that "you" may have been involved in the criminal activity.

As we stressed in *Hicks*, moreover, the individualized nature of reasonable suspicion is central to the *Terry* regime. Here, because Jackson was the lone individual running directly from the location of a crime just after it occurred and admitted to running because of the gunshots, there can be no doubt that Officer Swinarski could suspect Jackson of the purported criminal activity and not anyone else. The Supreme Court of Ohio similarly emphasized this point in *Hairston*. Thus, contrary to Justice Wecht's suggestions, these points are salient to our objective review of the totality of the circumstances of this case. Indeed, appellate courts must be vigilant to avoid viewing facts in isolation when making reasonable suspicion determinations; for example, that Jackson did not have blood on his clothes; that Jackson did not ask for help from Officer Swinarski; that Jackson was the lone individual on the street; or that Jackson responded to Officer Swinarski that he was "running from the gunshots." Each fact alone may be insufficient for reasonable suspicion, but our standard of review requires that we consider the totality of the circumstances at issue. When doing so, it becomes clear that an officer

in Officer Swinarski's position could reasonably have suspected Jackson of criminal activity, despite that his conduct could be also be viewed as normal.[18]

## V. Conclusion

Under the Fourth Amendment to the United States Constitution and Article I, Section 8 of the Pennsylvania Constitution, and pursuant to *Terry* and its progeny, an officer's investigative detention of an individual must be supported by reasonable suspicion. In analyzing whether an officer possessed the requisite reasonable suspicion to justify the detention, we view the totality of the circumstances to determine whether the officer had a particularized and objective basis for suspecting that the detained individual was, or was about to be, engaged in criminal activity. Because we agree with the Superior Court that Officer Swinarski had a particular and objective basis for suspecting Jackson of criminal activity under the totality of the circumstances presented, we would affirm the order of the Superior Court.

Chief Justice Todd and Justice Mundy join this opinion in support of affirmance.

---

[18] Justice Wecht overstates the breadth of this opinion. OISR at 19 ("The impact of today's decision cannot be overstated. The sad reality is that mass shootings are familiar in today's society. . . . All persons fleeing from those situations now are in danger of having their privacies invaded . . . . *Terry* was never intended to apply in this manner."). This case does not concern a mass flight from the area of a mass shooting; it concerns a "focused, limited, individualized detention[]" that was intended to be "brief in duration and narrow in scope"—*i.e.*, precisely how the United States Supreme Court intended *Terry* to apply. *Id*. If circumstances such as those suggested by Justice Wecht come before this Court, we are well-equipped to determine whether the detaining officer had reasonable suspicion based on an objective review of the totality of the circumstances that the detainee was, or was about to be, engaged in criminal activity.